**In re Tommie Lee MELTON, Appellant.**

**No. 85–1589.**

District of Columbia Court of Appeals.

Argued En Banc Feb. 6, 1991.
Decided Oct. 4, 1991.

Harry J. Fulton, Public Defender Service, with whom James Klein, Public Defender Service, and Page Kennedy, Public Defender Service, were on the brief, for appellant.

Janet L. Maher, Asst. Corp. Counsel, with whom Frederick D. Cooke, Corp. Counsel at the time the original brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Ann O'Regan Keary, Deputy Corp. Counsel, were on the brief, for District of Columbia.

Jay B. Stephens, U.S. Atty., and John R. Fisher, John M. Facciola, Colleen M. Ken-

nedy, and Nancy R. Page, Asst. U.S. Attys., filed a brief, for U.S. as amicus curiae.

Before ROGERS, Chief Judge, and FERREN, TERRY, STEADMAN, SCHWELB, and WAGNER, Associate Judges, MACK, and BELSON,* Senior Judges.

## ON REHEARING EN BANC

SCHWELB, Associate Judge:

This case presents interesting and vigorously contested issues which apparently arise with some frequency in civil commitment proceedings brought pursuant to the Ervin Act, D.C.Code §§ 21–501 to 21–592 (1989). Appellant Tommie Lee Melton is a 44–year–old man, diagnosed as a paranoid schizophrenic, who has frequently been hospitalized on account of his illness. On October 25, 1985, following a jury trial, Melton was found to be likely to injure himself or others[1] within the meaning of D.C.Code § 21–521 (1989). The trial judge committed Melton to the custody of Saint Elizabeth's Hospital (the hospital) for an indefinite period for outpatient treatment at the hospital's Spring Road Clinic.

On November 26, 1989, a divided panel of this court reversed the commitment order. *In re Melton*, 565 A.2d 635 (D.C.1989) (*Melton I*). The division majority was of the opinion that the psychiatric witnesses called by the District were erroneously permitted to testify that Melton was likely to injure himself or others, in that their expertise with respect to predicting dangerousness was said not to have been sufficiently established. The majority also held that the trial court had erroneously permitted these witnesses to testify regarding events of which they had learned from third parties or from hospital records, without first making the necessary finding that experts in the field reasonably and customarily rely on such materials. On November 7, 1990, we vacated the division opinion and ordered

that the case be reheard en banc. *In re Melton*, 581 A.2d 788 (D.C.1990).

Distilled to its essence, the District's psychiatric evidence tended to show that when Melton was not adequately supervised, he often failed to report for the medication which was required by his condition. As a result, he was unable to care for himself, wallowed in filth, and placed his health in serious danger from diabetes, glaucoma, and alcoholism. Moreover, the psychiatrists concluded, substantially on the basis of information provided to them by others, that when Melton did not adhere to his regimen of medication, he constituted a danger to others, as demonstrated by punching his mother in the nose, threatening his sister with a screwdriver, and acting in an assaultive and disruptive manner.

In the context of this case, which was focused so heavily on Melton's deterioration when he failed to take his prescribed medication, we are satisfied that the trial judge correctly found the District's psychiatric witnesses to be qualified to testify with respect to whether Melton was likely to injure himself or others if he was left to his own devices and without medical supervision. Where, as here, the issue presented was Melton's dangerousness, the evidence on which the District's psychiatric witnesses relied, including statements by members of Melton's family and records of his past hospitalizations, was of a kind reasonably and customarily relied on by experts in the field. Although we have pronounced reservations regarding the efficacy of the trial judge's limiting instructions to the jury as to the purpose for which statements of third parties could properly be considered, we find no reversible error. Accordingly, we affirm the judgment.

## I

### THE FACTS

The procedural history of this case and the evidence presented at trial were dis-

---

* Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

1. The verdict form did not require the jury to differentiate between the likelihood that Melton would injure himself and the likelihood that he would injure others.

cussed in considerable detail in the opinion of the panel majority, as well as in the dissent. *Melton I, supra,* 565 A.2d at 635–41, 649–50. We refer the reader to those discussions, and recite here only the facts which we view as most important for the resolution of the issues before us.

The only witnesses at the trial were two psychiatrists who were qualified as experts in their field and who testified for the District of Columbia. The first, Dr. James Byrd, was the administrator of the ward at which Melton was placed after he was involuntarily hospitalized in this case. The second, Dr. Antoine Cornet, was a staff psychiatrist at the hospital's Spring Road Mental Health Clinic. Both witnesses related some facts which were within their personal knowledge, but each also relied in substantial measure on what he had learned from others and from the records of Melton's prior hospitalizations.

Both Dr. Byrd and Dr. Cornet testified that Melton was suffering from schizophrenia. Dr. Byrd stated that this was true "without a doubt," that he was able to make the diagnosis on the basis of his personal observation, and that schizophrenia was the "remarkably consistent" diagnosis of all of the doctors who had treated Melton. He described schizophrenia as a "major psychiatric illness," which causes the patient to suffer from delusions and from a distortion of reality, and which renders him unable to recognize his own disease. Dr. Byrd added that Melton's schizophrenia was paranoid in character, and that Melton had "delusional" feelings that others were out to harm him.

The circumstances leading up to the hospitalization that precipitated the present case were also described by both of the doctors. Several months before his rehospitalization, Melton had left the hospital against medical advice and had gone to Florida.[2] When he returned in July 1985, and proceeded to his mother's house, the mother made a number of calls to the hospital reporting that he was behaving in a belligerent and disruptive manner, and she asked that something be done immediately. The mother reported, among other things, that Melton had punched her on the nose, and that she was afraid that he might harm her again.

Representatives of the hospital, including (eventually) Dr. Cornet, went to the mother's home and attempted to persuade Melton to come voluntarily to the hospital or to the clinic. Melton was belligerent and refused to come; his mother was visibly upset. The police were called, and an officer asked Melton to accompany him voluntarily. When Melton again refused to go, the officer brought him to the hospital in custody.

Melton's condition when he arrived at the hospital was not favorable. Dr. Byrd testified that Melton was "completely disheveled, extremely untidy, extremely dirty, having not bathed for weeks, urinating in his bedroom." Dr. Cornet testified that Melton "was filthy and in very poor condition" and that "[h]is personal hygiene was terrible, so we took care of that."

Nor were Melton's problems confined to grooming deficiencies. A diabetic, he had "excoriations" (bruises) on his skin, a condition which made Dr. Cornet "really concerned." Dr. Cornet also discovered that Melton was suffering from glaucoma. Dr. Cornet testified that hospital staff members found a large bottle of pills at the home of Melton's mother. The bottle contained both Orinese, a diabetic medication, and Melleril, which had been prescribed for Melton's mental illness; "in other words, you had medication for mental condition plus medication for diabetes mixed together in one bottle." Melton also apparently drank alcohol to excess, and the doctors were concerned that he would do so while taking his medication and warned him against doing so.

2. Dr. Byrd testified, on the basis of pertinent hospital records, that in November 1984, Melton threatened to kill his mother. He was taken into custody by police on that occasion and brought to the hospital as an "emergency." Dr. Byrd also related that the pattern of threats against the mother was repetitive and almost identical for all ten of Melton's prior admissions, that Melton had also threatened to stab his sister with a screwdriver and that "the record has numerous examples of this sort of thing."

Both Dr. Byrd and Dr. Cornet attributed Melton's threatening and assaultive behavior, as well as the poor condition in which he was found, to his failure to adhere to his treatment regimen. In particular, they alluded to his having missed injections of Prolixin, a medicine which had been prescribed for him and which had proved most beneficial. Dr. Byrd testified that "the reason [Melton] was placed on Prolixin is that it's possible to get Prolixin in an injectable form which will last for two weeks." He explained that there had been a marked improvement in his patient while the latter was in the hospital, but

> that [the improvement] was critically dependent upon Mr. Melton continuing to take his medication. And the changes that we see are changes which are quite helpful but they are in their own way fragile, in the sense that if he stops the medication he will rapidly decompensate....[3] If he misses one or two injections, he will be right back to where he started from, which is psychotic and threatening and assaultive and very bizarre and delusional.

Dr. Cornet confirmed that if Melton did not continue to receive his medication, "he won't be able to comprehend what's going on with him and chances are he might get really sick again."

Dr. Byrd testified that the program of medication which the hospital had devised would provide Melton with

> the best chance of complying with his treatment, which he had a long history of not doing. He hadn't been able to follow his treatment for the past ten [to] fourteen years.

Dr. Cornet also expressed doubt that, without proper supervision, Melton would continue to report for medication on his own initiative, especially when he was drinking. He stated that "Melton is not composed enough to take proper care of himself and to look for medical care when there is a need for that."

Not all of the testimony was unfavorable to Melton's cause. Dr. Byrd acknowledged that Melton was sometimes able to comply with his regimen on his own, and came in to the clinic when he felt that his mother was being "crabby." Dr. Cornet stated that on the day that Melton allegedly punched his mother, a member of the hospital staff apparently found "nothing amiss." Dr. Cornet also acknowledged that when Melton received his medication, his insight into his illness was good, and he understood the need for treatment. Dr. Byrd agreed, but described Melton's ability to seek help as "superficial," because he had no "consistent" insight into his illness; the insight vanished when Melton was not receiving medication. In any event, in light of the importance to Melton's mental health of his taking medication regularly and his record of unreliability unless adequately supervised, both psychiatrists testified that, if released, he would be likely to injure himself[4] or others.

## II

## THE PSYCHIATRIC TESTIMONY AS TO DANGEROUSNESS

■ When the District proffered Dr. Byrd as an expert witness in the field of psychiatry, Melton's counsel objected on the grounds that the doctor's involvement in the case was "minimal" and that he had only "just finished" his training. The judge overruled the objection and found Dr. Byrd to be qualified to testify as an expert. Counsel for Melton interposed no objection to Dr. Cornet's qualifications, and does not contend on appeal that the trial judge abused his discretion (or, in Dr. Cornet's case, committed "plain error") in holding that each of the witnesses was properly qualified as an expert.

After testifying that Melton was mentally ill, however, Dr. Byrd was asked to state his opinion whether, in light of the mental

---

3. Dr. Byrd stated that "decompensate" means "get worse again and go back."

4. *In terms of Melton's own safety, Dr. Byrd testified that "on one of his admissions he came* in because he threatened to set himself on fire. Another one he came in and he jumped out of a moving car on the way to the hospital."

illness, Melton would be likely to injure himself or others if he were not under the care of the hospital. Melton's counsel objected. Noting that "we've been through this before," the judge overruled the objection, but allowed Melton's counsel to make a record at the bench. Going directly to the heart of the issue, the judge asked whether counsel was maintaining that "the doctor who made the examination [of] the records [and] the staff cannot say that if he will be released today that he will not take his medication or, in his opinion ..., would be likely to injure himself or others? Is that what you're saying?" Relying on a trial court opinion in another case, Melton's counsel responded that a physician had no "particular ability" to predict dangerousness. Insisting that "we have heard nothing about this doctor being able to predict the future," and that "predicting the future, I would submit, is a very difficult thing," counsel insisted that the government was obliged to qualify the witness further. The judge adhered to his original ruling, held that no further qualification was required, and permitted Dr. Byrd to answer the question.

Although no comparable objection was made with respect to Dr. Cornet's testimony,[5] Melton argues on appeal that the trial judge committed reversible error in permitting the two doctors to testify regarding Melton's alleged dangerousness to himself or others without a separate demonstration of their expertise on that subject. A majority of the panel which heard the original appeal upheld this contention. *Melton I, supra*, 565 A.2d at 647–49. Specifically, the panel was of the opinion that the trial judge abused his discretion by "refus[ing] to consider Melton's counsel's objection to the psychiatrists' qualifications to predict his clients' dangerousness." *Id.* at 648.

The criteria for admitting expert testimony in this jurisdiction are set forth in the three-part test in *Dyas v. United States*, 376 A.2d 827 (D.C.1977), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977), as follows:

> (1) the subject matter 'must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average [lay person]'; (2) 'the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his [or her] opinion or inference will probably aid the trier in his [or her] search for truth'; and (3) expert testimony is inadmissible if 'the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.'

376 A.2d at 832 (quoting EDWARD W. CLEARY, MCCORMICK ON EVIDENCE § 13, at 29–31 (2d ed. 1972)) (emphasis deleted). "The trial judge has wide latitude in the admission or exclusion of expert testimony, and his [6] decision with respect thereto should be sustained unless it is manifestly erroneous." *Coates v. United States*, 558 A.2d 1148, 1152 (D.C.1989). The question whether an expert has been sufficiently qualified is likewise "recognized as a matter for the trial judge's discretion reviewable only for abuse. *Reversals for abuse are rare.*" E. CLEARY, MCCORMICK ON EVIDENCE § 13, at 34 (3d ed. 1984) (emphasis added and footnote deleted).

As Judge (later Chief Justice) Burger wrote for the court in *Baerman v. Reisinger*, 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966),

> [i]t is settled law that [a] physician is not incompetent to testify as an expert merely because he is not a specialist in the particular field of which he speaks. The training and specialization of the witness goes to the weight rather than admissibility of the evidence, generally speaking.

(Citations and internal quotation marks deleted). Ordinarily, a specialist in a particular branch within a profession is not re-

---

5. See the panel opinion, 565 A.2d at 636 n. 3, 647 n. 30, in which it is suggested that, in light of the trial judge's ruling with respect to Dr. Byrd, any similar objection with respect to Dr. Cornet would have been futile.

6. Or her.

quired. *See* McCormick, *supra*, § 13, at 34 & n. 11. Even an ordinary medical practitioner is, and should be, permitted to testify as to a patient's sanity. *See* 2 John Henry Wigmore, Evidence in Trials at Common Law § 569, at 785–86 & n. 2 (James H. Chadbourn rev. ed. 1979); *see Jenkins v. United States*, 113 U.S.App.D.C. 300, 306–07, 307 F.2d 637, 643–44 (1962) (en banc).[7]

Both Dr. Byrd and Dr. Cornet are practicing psychiatrists. Each stated that he was eligible for board certification. Each had previously testified as an expert before the Mental Health Commission, and Dr. Byrd had done so in court as well. As we show below, the prediction of dangerousness is reasonably related to the practice of psychiatry. Both witnesses were obviously more qualified with respect to this subject than an ordinary physician, and neither expressed any reservation about his ability to form an opinion regarding the question whether Melton was likely to injure himself or others.

In the present case, as we have noted, Melton's dangerousness to himself and others was alleged to stem from his failure, when not under the hospital's supervision, to take psychotropic medicine with the requisite regularity. The consequences of such failure are, in our view, so " 'distinctively related [lay person] to some science . . . as to be beyond the ken of the average layman,' " *Dyas, supra*, 376 A.2d at 832 (citation and emphasis omitted). It defies common sense to suggest that a lay juror knows as much as a qualified psychiatrist does about what is likely to happen if a schizophrenic patient does not receive Prolixin shots. The doctors' testimony would therefore probably "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Accordingly, the psychiatric testimony in this case satisfied the first prong of *Dyas*.

The judge could likewise reasonably conclude that Dr. Byrd and Dr. Cornet had sufficient knowledge of the characteristics of Prolixin and of the potential consequences of Melton's not taking it, as well as sufficient familiarity with other matters related to Melton's condition, that their testimony could " 'probably aid the [lay jurors] in [their] search for truth,' " as required by the second prong of the *Dyas* test. 376 A.2d at 832 (emphasis and citation omitted). If the testimony of "the ordinary medical practitioner should be received on all matters as to which a regular medical training necessarily involves some general knowledge," 2 Wigmore, *supra*, § 569, at 785, then *a fortiori*, the judge did not abuse his discretion in permitting Dr. Byrd and Dr. Cornet to express expert opinions as to the probable consequences for Melton of not requiring him to report for medication. When an oncologist testifies that a malignancy, unless properly treated, is likely to metastasize and cause danger to the patient, he too is predicting the future. Nevertheless, such a cancer specialist need not demonstrate expertise with a crystal ball as well as in medicine in order to render his prognosis receivable in evidence. The same holds true for a psychiatrist.

In the final analysis, Melton's argument must therefore stand or fall on the notion that the present state of psychiatric knowledge does not permit the District's witnesses to express opinions on the question of Melton's dangerousness to himself or others, within the meaning of the third prong of *Dyas*, 376 A.2d at 832. We do not believe that this question can seriously be said to be in doubt. " '[T]here is nothing inherently unattainable [even] about a [lay judicial officer's] prediction of future criminal conduct' " for purposes of preventive detention. *United States v. Salerno*, 481 U.S. 739, 751, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987) (quoting *Schall v. Mar-*

---

**7.** Relying primarily on cases involving expert testimony by psychologists who were not physicians, a majority of the panel which heard this case was of the opinion that *the mere fact that* Dr. Byrd and Dr. Cornet were psychiatrists did not render them competent under *Baerman* and *Jenkins* to testify regarding dangerousness.

*Melton I, supra*, 565 A.2d at 648. Some psychiatrists, the panel suggested, might be competent to do so, while others may not. *Id.* The dissenting opinion analyzed and distinguished the authorities relied upon by the majority. *Id.* at 652–53 n. 9. We do not reopen that debate here.

*tin,* 467 U.S. 253, 278, 104 S.Ct. 2403, 2417, 81 L.Ed.2d 207 (1984)). A trained psychiatrist must surely be qualified, *a fortiori,* to assess Melton's dangerousness to himself or others, especially where, as here, that assessment is based on the patient's need for medication and his failure in the past to take it with the requisite regularity. As the Supreme Court stated in *Addington v. Texas,* 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979),

> [t]here may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts *which must be interpreted by expert psychiatrists and psychologists.*

(Emphasis added to last nine words).

In *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), a capital sentencing case, the defendant argued, in conformity with the views of the American Psychiatric Association (APA),[8] that psychiatric testimony as to dangerousness is inherently unreliable and ought not to be admitted where a defendant's life is on the line. The issue was cast in constitutional terms, but the Supreme Court's response was sufficiently broad and emphatic to dispel any appreciable doubt as to how that Court would rule in this case:

> The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel. In the first place, it is contrary to our cases....
>
> In the second place, the rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party. Psychiatric testimony predicting dangerousness may be countered not

only as erroneous in a particular case but also as generally so unreliable that it should be ignored. If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, *jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.*

*Id.* at 896, 898–99, 103 S.Ct. at 3396, 3397 (emphasis added).

Melton seeks to distinguish *Barefoot* on the ground that it involved a constitutional contention, and that psychiatric testimony as to dangerousness should be excluded as a matter of the substantive District of Columbia law of evidence. Aside from the breadth of the Court's language in *Barefoot* and its allusion to applicable rules of evidence, however, the statutory law of this jurisdiction explicitly contemplates that such determinations will be made by psychiatrists. The administrator of a public hospital may detain a person for emergency observation if the psychiatrist on duty certifies that the person

> has symptoms of a mental illness and, as a result thereof, is likely to injure himself or others unless he is immediately hospitalized.

D.C.Code § 21–522 (1989). The Mental Health Commission, which is made up of psychiatrists and psychologists, is required to determine, *inter alia,* whether a patient "is likely to injure himself or other persons if allowed to remain at liberty." § 21–544. Two physicians, one of whom must be a specialist on nervous or mental disorders, are required to determine whether an allegedly mentally ill person found on certain federal reservations shall be hospitalized "for his own safety and welfare and for the preservation of the peace and good order." § 21–902(b)(2). In proceedings to determine whether a person acquitted of an offense by reason of insanity should be released, psychiatric testimony may be submitted on the issue whether such person "has recovered his sanity" and "will not in

---

**8.** Melton's counsel has presented for our consideration in this case the same views of the APA

which were rejected by the Court in *Barefoot.*

the reasonable future be dangerous to himself or others." § 24–301(e)(1)–(2).[9]

We therefore agree with the District that to accept appellant's theory that psychiatrists cannot predict dangerousness, and therefore should not be permitted to testify on this issue, would nullify the entire legislative scheme for treatment of mentally ill persons in the District of Columbia. The legislature has effectively decided that " 'the state of the pertinent art or scientific knowledge [permits] a reasonable opinion to be asserted ... by an expert,' " *Dyas, supra,* 376 A.2d at 832 (citation omitted), and we would be impermissibly intruding upon a legislative prerogative if we were to challenge that judgment.

### III

### THE PSYCHIATRISTS' RELIANCE ON OUT–OF–COURT STATEMENTS AND MATERIALS

*A. General Considerations.*

■ Early in his direct examination, Dr. Byrd was asked to describe the events which led up to Melton's hospitalization. Dr. Byrd concededly was not personally present when those events occurred, and Melton's counsel objected, characterizing the proposed testimony as hearsay. The following colloquy ensued:

> THE COURT: Of course it's hearsay. Of course it's hearsay. It's an exception, however, Mr. Fulton [Melton's counsel]. Go ahead, Doctor.
>
> MR. KELLY [Counsel for the District]: It certainly is, Your Honor.
>
> THE COURT: Mr. Fulton, please be seated. Go ahead.
>
> MR. FULTON: If I might, Your Honor, could we come to the bench?
>
> THE COURT: Mr. Fulton, no. We won't get the case started. We'll never get started at the rate we're going. Go ahead, Mr. Kelly.

In conformity with this preemptive ruling, both psychiatrists were subsequently permitted to relate information which they received from Melton's mother—the alleged punch on the nose—or from hospital records which had not been introduced into evidence. The mother, who apparently left for Florida during the trial as a result of a death in the family, did not testify and was not subject to cross-examination. Melton contends that he was thus denied an important liberty interest on the basis of what he describes as hearsay evidence, that he was deprived of the opportunity to confront and cross-examine those persons who had first-hand knowledge of the facts, and that the trial judge's summary ruling on his objection led to the admission of the alleged hearsay without the judge having made certain preliminary findings said to be required by law.

We begin by noting that the testimony by Dr. Byrd and Dr. Cornet as to what

---

**9.** We note that none of the statutory provisions cited suggests that only some special type of psychiatrist, trained in the art of predicting the future, can make the necessary determination. It is improbable, to say the least, that a legislature which contemplated determinations of dangerousness by two doctors, only one of whom must be a specialist in mental or nervous disorders, *see* § 21–902(b)(2), intended that testimony on the subject by qualified psychiatrists be precluded unless separate expertise on future dangerousness was first established. In asking us to divide psychiatrists into those who are experts on dangerousness and those who are not, Melton places "too much focus on a [purported] specialty and too little focus upon the [facts] alleged." *Ornoff v. Kuhn and Kogan Chartered,* 549 A.2d 728, 731 (D.C.1988); *see also Kling v. Peters,* 564 A.2d 708, 715–16 (D.C.1989).

Judge Ferren states in his dissenting opinion, *post* at 912, that even if the psychiatrists were qualified to testify about Melton's dangerousness to himself, they had no expertise on his dangerousness to others. There is nothing in this record to suggest that the two witnesses were less qualified to discuss the latter subject than the former. See pages 895–896, *supra.* Indeed, each was qualified to discuss both. Melton's dangerousness to himself and to others turned largely on his failure to take medication, a subject about which both psychiatrists necessarily knew more than a lay juror could reasonably be expected to know. Moreover, Judge Ferren's relation of excerpts from the testimony of two other psychiatrists in two different cases, each unrelated to and tried long after this one, *see post* at 912–913, cannot properly be relied upon in relation to the qualifications of Dr. Cornet and Dr. Byrd as they appear on this record.

they learned from others was not admitted in order to prove the truth of the matter asserted. *See* McCormick, *supra,* § 246, at 729. The trial judge specifically instructed the jury that any out-of-court statements by third parties which were reported in the experts' testimony were to be considered only "for the purpose of evaluating the reasonableness and correctness of the doctors' conclusions," and not "to establish the truth of the matters asserted by [the declarants]." As the court explained in *United States v. Williams,* 447 F.2d 1285, 1290 (5th Cir.1971) (en banc), *cert. denied,* 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972),

> [a]n expert's opinion is derived not only from records and data, but from education and from a lifetime of experience. Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, *that opinion is regarded as evidence in its own right and not as hearsay in disguise.*

(Emphasis added.)

The problem raised by Melton cannot, however, be avoided simply by calling the evidence expert testimony rather than hearsay. Labels cannot perform juridical alchemy. By resort to expert testimony, the District was able to bring to the jury's attention matters that could obviously prejudice Melton, including, *e.g.,* reports that he had punched his mother, and that on an earlier occasion he had threatened his sister with a screwdriver. Melton was never able to cross-examine those who accused him of these antisocial acts. Such a procedure presents obvious problems of basic fairness. Courts are not blind to these concerns and have attempted to fashion rules which afford reasonable latitude to expert witnesses but simultaneously protect the rights of litigants against whom expert testimony has been offered. The tension between these competing interests is at the heart of this case.

**B. Rule 703.**

The admission or exclusion of expert testimony, as we have noted, is committed to the trial court's broad discretion. *Coates, supra,* 558 A.2d at 1152. That discretion is guided in the District of Columbia by the principles underlying Rule 703 of the Federal Rules of Evidence, which provides as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to [the expert] at or before the hearing. If of a type *reasonably relied upon by experts in the particular field* in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(Emphasis added). *See* Steffen W. Graae & Brian T. Fitzpatrick, The Law of Evidence in the District of Columbia 7.20 (1989), *quoted in L.C.D. v. District of Columbia ex rel T–A.H.D.,* 488 A.2d 918, 921 n. 8 (D.C.1985) ("Rule 703 is an expression of the law as it has developed here"). According to the Advisory Committee's Note to Rule 703, "the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court."

The critical inquiry, then, is whether the facts or data to which Dr. Byrd and Dr. Cornet alluded in reaching their conclusions in the present case were of a type on which experts in their profession reasonably rely.[10] As the court stated in *Jenkins, supra,* 113 U.S.App.D.C. at 304, 307 F.2d at 641, a case dealing with the admissibility of expert psychiatric testimony,

> the better reasoned authorities admit opinion testimony based, in part, upon reports of others which are not in evidence but which the expert customarily relies upon in the practice of his profession.... 'This court ... will not close

---

**10.** The language used in some of our cases is "*customarily* rely." *See, e.g., In re Samuels,* 507 A.2d 150, 153 n. 5 (D.C.1986); *Edwards v. United States,* 483 A.2d 682, 685 (D.C.1984). In most cases, the two adjectives are likely to lead to the same result, but we adopt the language of Rule 703.

the doors of the courts to the light which is given by a diagnosis which all the rest of the world accepts and acts upon, even if the diagnosis is in part based upon facts which are not established by the sworn testimony in the case to be true.' [11]

The court declined to " 'shut its eyes to a source of information which is relied on by mankind generally in matters that involve the health and may involve the life of their families and of themselves....' " *Id.* at 304, 307 F.2d at 641 (quoting *Sundquist, supra* note 11, 221 N.W. at 393); *see also Reed v. United States,* 584 A.2d 585, 591 (D.C.1990).

### C. Psychiatric Expert Testimony.

Consistently with these principles, this court has held that psychiatrists may offer opinions based on reports not in evidence if such reports are reasonably relied upon in the practice of their profession. Testimony similar to much of that at issue here has been held to be admissible. *See In re Gahan,* 531 A.2d 661, 666 n. 7 (D.C.1987) ("[t]he court, as factfinder, was entitled to learn the factors underlying Dr. Carter's opinion that Gahan was likely to inflict harm on himself by ceasing to eat"); *Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 676–84, 480 A.2d 807, 812–16 (1984) (psychiatrist permitted to base his conclusion as to attorney's mental state on descriptions of attorney's behavior provided by the attorney's wife and by his partner).

In the present case, the inquiry for Dr. Byrd and Dr. Cornet was whether Melton, if left to his own devices without supervision by the hospital, would be likely to pose a danger to himself or to others. In light of the wide latitude afforded to trial judges in relation to the admission or exclusion of expert testimony, the precise issue on appeal is whether the trial judge abused his discretion in ruling—albeit implicitly and without appreciable articulation[12]—that in assessing Melton's dangerousness, a psychiatrist would reasonably rely on the reports and observations of family members and the records of Melton's past hospitalizations.

We do not find this issue to be an especially troublesome one. The Advisory Committee's Notes to Rule 703 recognize that

a physician in his [or her] own practice bases his [or her] diagnosis on information from numerous sources and of considerable variety, *including statements by patients and relatives,* reports and opinions from nurses, technicians and other doctors, *hospital records,* and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His [or her] validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

(Emphasis added). The conclusion that a competent psychiatrist charged with assessing dangerousness would obtain information from the patient's relatives, as well as from his hospital records, is also dictated by what Justice Frankfurter has described as "the saving grace of common sense." [13] Where else would the doctor go for such information? Indeed, as the United States points out in its brief as *amicus curiae,* a psychiatrist could be roundly criticized within and without the profession for *not* interviewing family members; by ignoring information which the profession views as vital, the psychiatrist would, at least, undercut the reliability of his or her opinion. *See, e.g., People v. Britz,* 123 Ill.2d 446, 460–63, 124 Ill.Dec. 15, 22–23, 528 N.E.2d 703, 710–11 (1988), *cert. denied,*

---

11. The last sentence of this passage is quoted from *Sundquist v. Madison Ry.,* 197 Wis. 83, 87, 221 N.W. 392, 393 (1928).

12. The judge stated only that the evidence was receivable under an unspecified "exception" to the hearsay rule.

13. *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955).

489 U.S. 1044, 109 S.Ct. 1100, 103 L.Ed.2d 242 (1989).[14]

This is not to say that everything a family member tells a psychiatrist is necessarily reliable or true. "[F]riends or relatives of an outpatient may seek his return to the institution because they feel uncomfortable in his presence or are dissatisfied with the progress he is making towards rehabilitation." *In re Richardson*, 481 A.2d 473, 480 (D.C.1984). Psychiatrists are well aware that this may occur. *See* Bernard L. Diamond & David W. Louisell, *The Psychiatrist as an Expert Witness: Some Ruminations and Speculations*, 63 MICH.L.REV. 1335, 1353 (1965). Indeed, they consider valuable for purposes of diagnosis any or all information provided by patients or relatives, whether the information is true or false. *See* 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE § 803(4)[01], at 803–150 (1990).

■ In any event, a properly qualified expert is assumed to have the necessary skill to evaluate any second-hand information and to give it only such probative force as the circumstances warrant. *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1245 (E.D.N.Y.1985) (Weinstein, J.), *aff'd*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); *see also State v. Schreuder*, 726 P.2d 1215, 1223 (Utah 1986).[15] Accordingly, the court should accord an expert wide latitude in choosing the sources on which to base his or her opinions. *See Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir.1983). But

> the court may not abdicate its independent responsibilities to decide if the bases meet minimum standards of reliability as a condition of admissibility. *See* FED. R.EVID. 104(a). If the underlying data

are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded. FED.R.EVID. 401, 402. The jury will not be permitted to be misled by the glitter of an expert's accomplishments outside the courtroom.

*"Agent Orange," supra*, 611 F.Supp. at 1245.

■ Because Rule 703 was intended to bring judicial practice into line with the practice of experts when they are not in court, *see* Advisory Committee's note quoted *supra* at page 902, the judge may not substitute his or her judgment for the expert's as to what data are sufficiently reliable, provided that such reliance falls within the broad bounds of reasonableness. *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 277–79 (3d Cir.1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also United States v. Hill*, 655 F.2d 512, 514–16 (3d Cir.1981) (error to exclude psychiatric testimony as to criminal defendant's susceptibility to entrapment), *cert. denied*, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984). "The proper inquiry is not what the court deems reliable, but what experts in the relevant discipline [reasonably] deem it to be." *Japanese Elec. Prods., supra*, 723 F.2d at 276 (bracketed word added).

■ "The assumptions which form the basis for the expert's opinion, as well as the conclusions drawn therefrom, are subject to rigorous cross-examination." *Id.* at 277. Juries are intelligent enough, in light of the availability of such cross-examination, to ignore what is unreliable or unhelpful. *Id.* at 279.[16] In most cases, therefore,

---

**14.** In *Britz*, the court upheld the exclusion of psychiatric testimony in a capital case because the experts failed to speak to friends or members of the defendant's family or to consult reports from the institutions at which the defendant had received treatment.

**15.** In the present case, Dr. Byrd explained that he tended to believe the allegation that Melton punched his mother and other similar accusations because "with all the multiple people doc-

umenting that, I do presume that there aren't many liars on that." The conclusion that these allegations tended to corroborate each other, and were consistent with Melton's failure to take his medication regularly, strikes us as an eminently reasonable one.

**16.** In the present case, for example, counsel for Melton was in a position to elicit from the psychiatrists that they were not present when Melton allegedly punched his mother and that a

objections to the reliability of out-of-court material relied upon by a psychiatrist will be treated as affecting only the weight, and not the admissibility, of the evidence. *Bertolotti v. Dugger,* 883 F.2d 1503, 1517 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990).

### D. The Test Proposed by the Panel Majority.

In its discussion of how the judge should determine whether "minimum standards of reliability," *"Agent Orange," supra,* have been met, the majority of the panel adopted the following test:

> a trial judge will properly admit expert opinion based on hearsay testimony under Rule 703 when (1) the judge is persuaded that experts in the field commonly rely on the particular type of hearsay information in addressing the specific type of problem raised in the case before the court, and (2) the judge concludes that the information (if not admissible for its truth under an exception to the hearsay rule) is *of a type for which the underlying reliability of the data can be sufficiently explored through cross-examination of the testifying expert.* Of course, a trial judge [3] should exclude an expert opinion, including the facts and data upon which it relies (even if of a type reasonably relied on most of the time), if admission in evidence would create a substantial danger of undue prejudice or would mislead the jury.

*Melton I,* 565 A.2d at 645 (emphasis added; citations and internal quotations marks omitted). The panel majority then strongly implied that in a great many cases, if not in most, a psychiatric's expert reliance on out-of-court statements by lay observers will not pass muster.

> We are not stating categorically that expert reliance on hearsay observations by laypersons will always fail to satisfy the second prong of the test set forth

*supra* at page 645. But, given the possibility that lay observers in some contexts (*e.g.,* a family with a mentally ill member) may not be disinterested, and given, further, that the expert's inability to vouch for the lay observer's reliability will not necessarily undermine the expert's own aura of authority,[17] a trial court must be very careful to evaluate whether the proffered expert testimony and its underlying sources can be effectively scrutinized before the jury.

*Id.* at 646. Melton urges us to adopt the panel majority's three-part test. We have no quarrel with the first and third prongs of this articulation, but are unable to agree with the second.

The United States has filed an excellent brief as amicus curiae in which it has effectively marshalled the arguments against the division's second prong. We cannot improve upon the government's "Summary of Argument," which we reproduce below in slightly edited form, annotated by authorities which, in our view, support the various propositions articulated therein:

> The panel opinion's holding, mandating classification and compartmentalization of the 'type' of [information] underlying expert opinion or inference in order to determine its source and susceptibility to cross-examination, constitutes a significant, ill-advised change in this court's long-established jurisprudence. The decisions of this court have held that an expert's opinion is not inadmissible simply because it is based on [what would otherwise be] inadmissible hearsay if persons within the field of expertise customarily or reasonably rely upon such [information] in arriving at opinions. This rule is consistent with other jurisdictions' reasoned analysis.
>
> There are adequate safeguards to ensure the integrity and fairness of proceedings when an expert opinion relying in part on inadmissible evidence is proffered: (1) this court's three-part *Dyas*

---

representative from the hospital found nothing amiss when he went to investigate.

**17.** We do not share this less than admiring view of the common sense of the average juror. *See*

*Riordan v. Kempiners,* 831 F.2d 690, 698 (7th Cir.1987) (Posner, J.) (criticizing "crabbed notions of relevance or excessive mistrust of juries").

test for the qualification of experts;[18] (2) this court's rule that the profession must customarily rely upon such inadmissible hearsay evidence;[19] (3) the trial court's broad discretion to exclude expert testimony that is more prejudicial than probative, founded on incompetent evidence, or mere speculation;[20] (4) the opposing party's right to cross-examine on the underlying data and introduce contrary evidence;[21] (5) the trier-of-fact's ability to determine the reliability and weight to be given to such evidence;[22] (6) the risk of nonpersuasion borne by the party with the burden of proof;[23] (7) the trial court's discretion to direct a verdict.... where there is insufficient evidence to support a jury's finding;[24] and (8) this court's authori-

ty to take corrective measures on appellate review, should the trial court abuse its discretion.

Moreover, the proposed rule would introduce new, intractable problems of law and administration.[25] It does not account for expert testimony founded only in part on otherwise inadmissible hearsay; it would lead to unwieldy hearings necessitating formidable, fine distinctions between types of hearsay and whether they are 'sufficiently' susceptible to cross-examination; and it would prevent the jury from hearing probative expert opinions that are developed in accordance with accepted professional norms and methodology, including relevant psychiatric testimony.[26]

18. See discussion at pages 897–898, *supra.*

19. See discussion at pages 901–902, *supra.*

20. *See Reed, supra,* 584 A.2d at 591.

21. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). In the present case, *Davis* is concededly a two-edged sword, for Melton could not cross-examine his mother. He could and did, however, point out the lack of first-hand knowledge on the part of the District's witnesses. Although the District had the burden of proof, Melton was also free to present evidence, if there was any, contradicting the events as described by out-of-court declarants.

22. *See Bertolotti, supra,* 883 F.2d at 1517.

23. The District must prove its case by "clear and convincing" evidence. *In re Nelson,* 408 A.2d 1233, 1236–37 (D.C.1979). This can render reliance on non-first-hand evidence a risky proposition.

24. As this court pointed out in *Lynch v. United States,* 557 A.2d 580, 582 n. 6 (D.C.1989) (en banc) (holding, in the context of "preventive" pretrial detention pursuant to D.C.Code § 23–1325 (1989), that a determination by clear and convincing evidence that an individual poses a danger to the community may be based on hearsay testimony),

> [a] trial judge may, of course, consider the hearsay character of the government's evidence in determining whether a clear and convincing showing has been made. The trial judge may, and in appropriate cases we are confident will, require that the hearsay evidence be buttressed by otherwise admissible

evidence to meet the clear and convincing standard.

Although the question of dangerousness in a civil commitment proceeding is ordinarily determined by the jury as the trier of fact, the judge may direct a verdict if no reasonable jury could find by clear and convincing evidence that the respondent is likely to injure himself or others. *See* Super.Ct.Civ.R. 50.

25. We agree with *amicus* that the panel majority's second prong would unnecessarily tax the finite resources of court and counsel by requiring extensive collateral inquiries into the character of the expert's sources, and would constitute an "unwarranted intrusion on the jury's authority to determine the proper weight to be accorded the testimony proffered by the parties." *Bethea v. United States,* 365 A.2d 64, 81 n. 36 (D.C.1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).

26. *See Jenkins, supra,* 113 U.S.App.D.C. at 304, 307 F.2d at 641. In *United States v. Sims,* 514 F.2d 147, 149 (9th Cir.) *cert. denied,* 423 U.S. 845, 96 S.Ct. 83, 46 L.Ed.2d 66 (1975), the court made the point as follows:

> It seems logical that an expert, such as a psychiatrist in formulating an opinion in a case such as this, should be permitted to interview the agents who made the investigation leading up to the indictment and secure from them relevant facts developed during the investigation. Because of his professional background, knowledge, and experience, we should, in circumstances such as these, leave to the expert the assessment of the reliability of the statements on which he bases his expert opinion. He should not be precluded, in forming an opinion, from interviewing those who for one reason or another have had occasion to investigate and study the defendant's

■ In the final analysis, we view Rule 703 as having been intended to permit expert witnesses, provided that minimal standards of reliability have been met, to rely in the courtroom on the same data which they use in the office or laboratory. The panel majority's second prong would effect a substantial and in our view unnecessary intrusion upon the expert's sources. Accordingly, we decline to adopt it, and adhere instead to Judge Weinstein's articulation in *"Agent Orange," supra*, 611 F.Supp. at 1245, which we have quoted at page 903 of this opinion.[27]

*E. Probative Value, Prejudice, and the Sufficiency of the Limiting Instruction.*

Even if, as we have concluded, the psychiatric witnesses testified on the basis of the kind of data on which experts in their field reasonably rely, we have some concern for another reason about the admission and use of the evidence. If we look at the substance rather than the form of what occurred, the second-hand testimony about Melton having punched his mother came to the jurors' attention in such a way that they might well have considered it for the truth of the out-of-court statement. This may also have occurred with respect to some other incidents.

On October 17, 1985, Dr. Byrd testified that Melton

> became impulsive and lost control of his temper, which is a characteristic of a schizophrenic. And he punched his mother in the nose and became very angry with her.

The trial judge gave no contemporaneous instruction as to the purpose for which this testimony was received. It was not until four days later, during his final instructions, that the judge told the jurors, with respect to testimony by Dr. Byrd and Dr. Cornet as to information given to them by other individuals, that

> these statements are admitted only to demonstrate the information relied upon by the doctors in forming their conclusion. They are to be considered by you only for the purpose of evaluating the reasonableness and correctness of the doctors' conclusions. They are not to be considered by you as actual proof of the incidents described. They are hearsay and as such are not admissible to establish the truth of the matters asserted by them.

This court has recently noted that some students of the law of evidence consider the distinction sought to be articulated in such a "limiting" instruction as "most unlikely to be made by juries." *Samuels, supra* note 10, 507 A.2d at 153 n. 5. As Judge Salzman aptly remarked for the court in that case,

> [c]onceptual problems are bound to arise when a judge tells a jury that the jury may consider psychiatric diagnoses based on medical records customarily relied on in professional practice, but then tells the jury that it may not consider the 'truthfulness' of those records for any other purpose.

*Id.* With his customary eloquence, Justice Cardozo made a similar point for the Court in a somewhat different context in *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 25, 78 L.Ed. 196 (1933):

> Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for

---

background. Years of experience teach the expert to separate the wheat from the chaff and to use only those sources and kinds of information which are of a type reasonably relied upon by similar experts in arriving at sound opinions on the subject.

27. We find it unnecessary and even fruitless to attempt to detail further, in the abstract, the minimal reliability standard, *cf. post* at 909–910 (Ferren, J., dissenting), except to emphasize again that it is a deferential one. Its application

will depend on the particular circumstances of each case. In the present instance, in determining Melton's dangerousness to himself or others, we think that on any reasonable view, the experts' consideration of information provided by Melton's relatives, or contained in records of his past hospitalizations, meets minimal standards of reliability. *See United States v. Lawson*, 653 F.2d 299, 302 n. 7 (7th Cir.1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982) and discussion at pages 907–908, *infra*.

psychoanalysts, that our rules of evidence are framed. *See also Clark v. United States*, 593 A.2d 186, 191 (D.C.1991).

The "conceptual" problems to which we referred in *Samuels* are especially serious with respect to a discrete dramatic act like punching one's mother on the nose. To tell the jurors that they are to consider the testimony about the punch as a basis for the expert's finding of dangerousness, but not with respect to whether Mr. Melton punched his mother, may call for mental gymnastics which only the most pristine theoretician could perform. We suspect that the reaction of that elusive individual, the reasonable person, would be that you cannot believe that the testimony about the punch tends to show that Melton is dangerous unless you first believe that he actually punched his mother. *See Clark, supra*, 593 A.2d at 193–94; *Giles v. United States*, 432 A.2d 739, 745–46 (D.C.1981). Since the expert apparently believed that he punched her, the jury was likely to believe it too. The distinction sought to be made may therefore become "ephemeral." *Thompson v. United States*, 546 A.2d 414, 421 (D.C.1988).

The problem is a perplexing one, because it is difficult to articulate reasonable or workable limits on any rule which would exclude testimony of the kind here at issue and still vindicate the policies underlying Rule 703. In the present case, however, the appeal was at least initially predicated upon the lack of a finding by the trial judge that the out-of-court statement was of a kind reasonably relied upon by experts in the field, with only a conditional allusion to the potential difficulty the jury might have with the task of confining its consideration of such evidence to the purposes for which it was received.[28] Similarly, no contention was made in the trial court that a limiting instruction would be ineffective, or even that such an instruction ought to have been given earlier, or in a different and more emphatic form.

Unfortunately, the abbreviated way in which the trial judge dealt with the so-called "hearsay" issue made it difficult for Melton's counsel to expound his theory fully.[29] As we have previously noted, the trial judge has the authority to exclude otherwise admissible expert testimony if he or she is of the opinion that such testimony would be more prejudicial than probative. In the present case, at least, if Melton's mother had been available to testify,[30] it would have been a permissible exercise of the judge's discretion to condition admission of the expert testimony (regarding the allegation that Melton punched the mother) on the District's also calling the mother to testify and on its making her available for cross-examination. Given the posture of the issue both in the trial court and on appeal, however, we conclude that Melton has failed to show that the trial judge abused his discretion in receiving the evidence. *See Samuels, supra* note 10, 507 A.2d at 153.

### F. The Lack of an Explicit Finding by the Trial Judge.

■ Unfortunately, the trial judge never made an explicit finding that psychiatric

---

28. In his original brief before the division, Melton argued conditionally that if the court fails to determine whether the information used by the psychiatrists possessed adequate indicia of reliability, then the limiting instruction is being asked to carry more weight than it was designed to hold. The argument was made under the heading "The lack of foundation for Dr. Byrd's opinion."

In his response to the amicus brief filed by the United States, Melton has adopted more broadly the concerns of the panel majority and of the dissenting opinion, *Melton I, supra*, 565 A.2d at 642, 654–55, that out-of-court statements regarding Melton's conduct would be considered by the jury for their truth because a limiting instruction would be difficult to follow.

29. It is evident from the opening statement of Melton's counsel that he was aware in advance of the issue that would arise. We suggest that in such circumstances a motion *in limine* should be filed, or that a ruling from the court should be sought before the seating of the jury. An early request for a ruling avoids interruption and even disruption of the testimony and facilitates the orderly and thoughtful resolution of legal issues.

30. No finding was made as to her availability. Counsel for the District indicated that the mother's departure in mid-trial had been sudden and unexpected.

experts reasonably rely on the kind of evidence which the District presented through the testimony of Dr. Byrd and Dr. Cornet. His sole articulated explanation—that an "exception" to the hearsay rule applied—cannot be viewed as the substantial equivalent of such a finding. Although Melton's counsel never explicitly directed the judge's attention to the need to address the question of "reasonable reliance," this may well be so because the judge denied counsel's request to approach the bench.

We decline to remand the case, in spite of the trial judge's failure to make an explicit finding on the question on which the admission of the contested evidence depended, because we are satisfied that to do so would be both unnecessary and futile. The authorities cited in this opinion, and especially the Advisory Committee's note to Rule 703, persuade us that the drafters of that Rule viewed psychiatric reliance on information provided by family members and hospital records as reliable in principle. In the present case, in which the issue was whether Melton was likely to injure himself or others, the failure to make such an inquiry would have been subject to justifiable criticism. The accounts by different family members tended to substantiate each other and to corroborate the psychiatric testimony as to the effects of failure to receive medication. We discern no appreciable possibility that the judge would make a finding that such reliance was unreasonable, when that result would be so contrary both to the teachings of the authorities which we have cited and to the judge's own rulings in this case.

The proper finding should have been made explicitly, but there was more than ample basis in the record for the judge to overrule Melton's objection. By contrast, the record gives us no reason whatever to conclude that the statements and records which the two psychiatrists described in their testimony are not of the kind reasonably relied on by experts in the field. As the court stated under very similar circumstances in *Lawson, supra* note 27, 653 F.2d at 302 n. 7,

> Lawson points out quite correctly that Dr. Sheldon never testified, and the district court never found, that this information was of the type reasonably relied upon by psychiatrists.[31] The court must make such a finding in order to satisfy the requirements of Rule 703. *United States v. Hollman,* 541 F.2d 196, 201 (9th Cir.1976); *Bauman v. Centex Corp.,* 611 F.2d 1115, 1120 (5th Cir.1980). We may take judicial notice, however, that psychiatrists customarily use such information to make a diagnosis. *See* Notes of Advisory Committee to Rule 703. The district court's error, under the circumstances in this case, is harmless.

To remand the case simply for the purpose of requiring the judge to make the prescribed finding now would be a symbolic rather than a practical act, which we view as unnecessary and as incompatible with "[g]ood judicial husbandry," *United States v. Dogan,* 314 F.2d 767, 772 (5th Cir.1963). Accordingly, we decline to prolong this already protracted proceeding further by remanding the case.

## IV

## CONCLUSION

For the foregoing reasons, the judgment appealed from is hereby

*Affirmed.*[32]

---

**31.** In *Lawson,* the psychiatrist had little contact with the patient, but relied on reports from other physicians and staff members, on tests administered at the Federal Medical Center, and on information received from the United States Marine Corps, the FBI, and the United States Attorney's office.

**32.** Melton also contends that the judge should have granted his motion for a directed verdict at the close of the District's case. We disagree, substantially for the reasons stated in the dis-

sent from the panel opinion. 565 A.2d at 655–56.

By letter dated September 13, 1991, Melton's counsel advised the court that Melton's status has been changed from committed patient to voluntary patient. No party has asked us to dismiss the appeal as moot, and we see no reason to do so. *In re Stokes,* 546 A.2d 356, 357 n. 1 (D.C.1988); *In re James,* 507 A.2d 155, 159 n. 5 (D.C.1986); *see also Honig v. Doe,* 484 U.S. 305, 332, 108 S.Ct. 592, 608, 98 L.Ed.2d 686 (1988) (Rehnquist, C.J., concurring).

FERREN, Associate Judge, with whom MACK, Senior Judge, joins, dissenting:

For the reasons expressed in the vacated division opinion, *In re Melton*, 565 A.2d 635 (D.C.1989), *vacated*, 581 A.2d 788 (1990), I would reverse and remand the case to the trial court with instructions to vacate Melton's civil commitment order.

### I.

The first issue is how a trial court is to determine whether the "facts or data ... upon which an expert bases an opinion or inference ... [is] of a type reasonably relied upon by experts in the particular field...." FED.R.EVID. 703. Everyone agrees that the court may not defer entirely to the proffered experts' own assessments of reliable hearsay.[1] So how does the court test those underlying sources?

In the division opinion, *Melton*, 565 A.2d at 643–45, we noted two extreme views. According to the Third Circuit, considered the so-called liberal admissibility view, the trial court "must make a factual inquiry and finding as to what data experts in the field find reliable. There is no discretion to forbear from making this inquiry and finding." *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 277 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under this approach, the court only considers whether experts customarily rely on the proffered data; no analysis is made of the reliability of the underlying data itself. The court leaves vigorous examination of the assumptions that form the basis for the opinion—including scrutiny of the underlying data—to cross-examination. *See id.*

At the other extreme, the "more restrictive view requires the trial court to determine not only whether the data are of a type reasonably relied upon by experts in the field, but also whether the underlying data are untrustworthy for hearsay or other reasons." *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1244 (E.D.N.Y.1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); *see Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir.1983) (Rule 703 requires trial court to examine reliability of expert's sources).

Consistent with the division opinion, the majority and I agree with Judge Weinstein, taking an intermediate position, that the trial court not only must make findings as to what data experts in the field find reliable but also must do something more to assure such reliance is reasonable. According to Judge Weinstein:

> [T]he court may not abdicate its independent responsibilities to decide if the bases [used by a qualified expert] meet minimum standards of reliability as a condition of admissibility. *See* FED.R.EVID. 104(a). If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded. FED.R.EVID. 401, 402.

*"Agent Orange,"* 611 F.Supp. at 1245; *see ante* at 902, 904–905.

The question, therefore, is what more the trial court must do to assure that expert reliance on particular data is reasonable—*i.e.*, to assure that "minimum standards of reliability," 611 F.Supp. at 1245, have been met? The majority opinion appears to incorporate Judge Weinstein's views in *"Agent Orange"* and leaves it at that. Based on the cases Judge Weinstein cited in support of his "minimum standards of reliability" test,[2] his view is closer to the

---

1. Amicus (the United States) notes it "agree[s] with appellant that 'the court cannot ... simply ... accept[ ] as reasonable reliance what the expert decided to rely upon.'" Amicus Brief at 5 (quoting Appellant's Brief at 22).

2. The cases cited, 611 F.Supp. at 1245, are: *United States v. Esle*, 743 F.2d 1465, 1474 (11th Cir.1984) (expert opinion based on untrustworthy market surveys); *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.*, 739

F.2d 1028, 1033 (5th Cir.1984) (unreasonable for expert to rely upon voice stress analysis); *United States v. Cox*, 696 F.2d 1294, 1297 (11th Cir.) (affirming exclusion of expert testimony that was based on hearsay knowledge of historical events not reasonably relied upon by experts in the field), *cert. denied*, [464 U.S. 827, 104 S.Ct. 99, 78 L.Ed.2d 104 (1983) ]; *Soden v. Freightliner Corp.*, 714 F.2d 498, 503–06 (5th Cir.1983) (exclusion of expert opinion

more restrictive, Fifth Circuit approach in *Soden* than to the liberal Third Circuit view in *Japanese Electronic Products.*

The division opinion—with which I still agree—supplied the following, more specific test for determining that the "minimum standards of reliability" have been met:

> (2) the judge [must] conclude[ ] that the information (if not admissible for its truth under an exception to the hearsay rule) is of a type for which the underlying reliability of the data can be sufficiently explored through cross-examination of the testifying expert.

*Melton*, 565 A.2d at 645 (citing S. SALTZBURG & K. REDDEN, FEDERAL RULES OF EVIDENCE MANUAL 671 (4th ed. 1986)). Under this test for the most appropriate and efficient way of evaluating whether an expert's data meets "minimum standards" and thus is "reasonably relied upon," FED. R.EVID. 703, the court must assure that the Third Circuit's premise in *Japanese Electronic Products,* 723 F.2d at 277, is sound as applied: that the expert knows enough about his or her sources of information, including how the data has been gathered and analyzed, that cross-examination can effectively explore the bases—including deficiencies—of the expert opinion.

The majority's (and the government's) concern about this "cross-examination" test to assure "minimum standards of reliability" apparently is attributable to the following two paragraphs in the division opinion:

> Where experts rely on lay observations of behavior or events, however, cross-examining experts about the reasonableness of their reliance on this data may be more difficult. Absent the ability of an expert to testify concerning both the manner in which a lay observer has perceived and recorded certain facts and whether that manner accords with methods of fact-gathering ordinarily relied upon, cross-examination may provide little or no insight into the reliability of the

basis for the expert opinion. In such circumstances a trial judge, therefore, may reasonably conclude that a jury will be incapable of performing its function of "determining the appropriate weight to be given to the testimony," *Japanese Electronic Products,* 723 F.2d at 278, and exclude the expert opinion. *See Note, Hearsay Bases [of Psychiatric Opinion Testimony: A Critique of Federal Rule of Evidence 703,* 51 S.CAL. L.REV. 129, 145 (1977)] ("[A]n opinion can be no better than the hypothesis or assumption upon which it is based.").

> We are not stating categorically that expert reliance on hearsay observations by laypersons will always fail to satisfy the second prong of the test set forth *supra* at page 645. But, given the possibility that lay observers in some contexts (*e.g.,* a family with a mentally ill member) may not be disinterested, and given, further, that the expert's inability to vouch for the lay observer's reliability will not necessarily undermine the expert's own aura of authority, a trial court must be very careful to evaluate whether the proffered expert testimony and its underlying sources can be effectively scrutinized before the jury.

*Melton,* 565 A.2d at 646 (footnotes omitted). This discussion in *Melton* does not say that expert opinion based in part on "lay observations of behavior or events," *id.,* is automatically excluded. It is not even intended to mean that expert opinion based entirely on such lay observations is automatically excludable, although it will be suspect (and very likely excludable) unless the expert can satisfactorily explain why under the circumstances such reliance is reasonable—surely not too much to expect. The point is this: before an expert testifies, the court must be able to know that counsel, on cross-examination, will be able to get to the heart of the expert's analysis and that the jury will hear a more

based on unreliable accident statistics); *Dallas & Mavis Forwarding Co., Inc. v. Stegall,* 659 F.2d 721, 722 (6th Cir.1981) (testimony of state trooper offered as an expert regarding cause of accident based on story of biased eye witness "the sort of hearsay testimony" Rule

703 meant to foreclose); *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1205 (E.D.N.Y.1983) (exclusion of expert opinion based on surveys lacking "sufficient indicia of trustworthiness" under Rule 703).

reasonable basis for reliance on hearsay than merely "trust me, I'm an expert."

Judge SCHWELB concludes that "[t]he panel majority's second prong would effect a substantial and in our view unnecessary intrusion upon the expert's sources." *Ante* at 906. I do not understand why that is true, or indeed why the division test is more intrusive than the verification-of-reliability efforts reflected in the cases Judge Weinstein cites in *"Agent Orange,"* see *supra* note 2, which the majority apparently accepts in simply adopting the Weinstein approach without elaboration.

Presumably, the majority requires the trial court to probe the experts to some extent about the reliability of the underlying data. Presumably, too, if the experts are not immediately convincing, the court will insist on deeper probing, perhaps with the help of counsel; for anything less would abdicate the trial court's independent responsibility. *See "Agent Orange,"* 611 F.Supp. at 1245. Such probing, as needed, is no less intrusive—or, as far as I can tell, materially more difficult—than the test in the vacated division opinion requiring the trial court to assure that "the underlying reliability of the [hearsay] data can be sufficiently explored through cross-examination of the testifying expert." *Melton,* 565 A.2d at 645. Thus, either the majority effectively agrees with the division opinion on this issue (despite denying it) or does not come to grips with the need to assure the "minimum standards of reliability" (as it purports to do). I cannot tell from Judge SCHWELB's opinion where the majority really stands.[3]

## II.

The second issue is whether the testifying psychiatrists, Dr. Byrd and Dr. Cornet, were qualified to render expert opinions on Melton's dangerousness to himself or to others. I agree that psychiatrists commonly testify about a person's dangerousness—and properly so. *See Barefoot v. Estelle,* 463 U.S. 880, 896–903, 103 S.Ct. 3383, 3396–3399, 77 L.Ed.2d 1090 (1983); *ante* at 898–899. I also agree that, under applicable caselaw, a proffered expert need not be a specialist in order to testify concerning matters requiring special expertise. *See Ornoff v. Kuhn and Kogan Chartered,* 549 A.2d 728, 732 (D.C.1988); *Baerman v. Reisinger,* 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966); *ante* at 897–898. But the flipside is this: whatever the expert's formal qualifications, the trial court must make sure that the proffered expert is qualified by training, knowledge, and experience to express an opinion on the subject about which he or she is called to testify. *See United States v. Davis,* 772 F.2d 1339, 1342–44 (7th Cir.) (psychiatrist's testimony properly excluded where she lacked expertise on compulsive gambling), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985); *see generally Melton,* 565 A.2d at 647–49. We have recently stressed this point: " 'it is the actual qualifications of the witness that count, rather than his [or her] title.... Just as the wrong title may mean that the witness is nevertheless qualified, the right title will not suffice if the witness does not have the qualifications required by the facts of the case.' " *District of Columbia v. Anderson,* 597 A.2d 1295, 1299 (D.C.1991) (quoting 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 702[04] at 702–51 (1990)).

In this case, the trial court refused to consider Melton's counsel's objections to the psychiatrists' qualifications (saying "[w]e've been through that before"), did not purport to exercise discretion, *see Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979), and thus, for all we can tell, declined to apply the criteria for admitting expert testimony. *See Ibn–Tamas v. United States,* 407 A.2d 626, 632–33 (D.C.1979)

---

**3.** Judge SCHWELB finds it "unnecessary and even fruitless to attempt to detail further, in the abstract, the minimal reliability standard." *Ante* at 906, n. 27. He then engages in appellate court fact-finding to ascertain—by mere assertion—that information provided by Melton's relatives and his hospital records "meets minimal standards of reliability." *Id.* If this is so obvious, then presumably counsel could assure the court and jury of that fact through cross-examination.

(quoting three-part test for expert admissibility in *Dyas v. United States*, 376 A.2d 827, 832 (D.C.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977)); *Japanese Elec. Prods.*, 723 F.2d at 277 (trial court has "no discretion to forbear from making ... inquiry and finding" as to "what data experts in the field find reliable"); *see generally Melton*, 565 A.2d at 648–49. The majority, however, makes its own findings from the record. Judge SCHWELB's opinion relies on Dr. Byrd's and Dr. Cornet's qualifications, based on long relationships with Melton, to justify their testifying about his dangerousness to himself from not taking prescribed medications. See *ante* at 898. I have two responses. First, the trial court, not the appellate court, must rule in the first instance; this court should not find facts. Second, even if the doctors were qualified to testify about Melton's danger to self, their opinions of his dangerousness focused as much, if not more, on Melton's dangerousness to others—an issue at the heart of Melton's civil commitment, an issue on which not all psychiatrists believe they are qualified to testify, *see Estelle v. Smith*, 451 U.S. 454, 472, 101 S.Ct. 1866, 1878, 68 L.Ed.2d 359 (1981),[4] and an issue which the

majority does not address *as to these particular psychiatrists*. As Judge SCHWELB recognizes, the jury merely found Melton dangerous to self *or* to others. See *ante* at 894 n. 1. We therefore cannot be sure the jury did not focus exclusively on dangerousness to others—a possibility that makes an expert's qualifications to testify on danger to others critically relevant.[5]

In a recent post-*Melton* probable cause hearing, D.C.Code § 21–525 (1989), the government's psychiatrist and only witness stated that he could not say there was a 50% or 70% chance that the respondent in that case, or in any case, was likely to be dangerous to self or others. This psychiatrist testified that psychiatrists are not generally capable of predicting future dangerousness with any accuracy. *See* Transcript at 8, *In re D.L.*, MH No. 86–90 (D.C.Super.Ct. Jan. 30, 1990).[6] In another recent case, the government's psychiatrist at a probable cause hearing reluctantly expressed an opinion about the respondent's dangerousness, noting that it was a very complicated field and the subject of some controversy and that his ability to express such an opinion varied from case to case. *See* Transcript at 10–11, *In re M.G.*, MH No. 155–90 (D.C.Super.Ct. Feb. 14, 1990).[7]

---

4. As the Supreme Court recognized in *Estelle v. Smith*, 451 U.S. 454, 472, 101 S.Ct. 1866, 1878, 68 L.Ed.2d 359 (1981):

    Indeed, some in the psychiatric community are of the view that clinical predictions as to whether a person would or would not commit violent acts in the future are "fundamentally of very low reliability" and that psychiatrists possess no special qualifications for making such forecasts. See Report of the American Psychiatric Association Task Force on Clinical Aspects of the Violent Individual 23–30, 33 (1974); A. Stone, Mental Health and Law: A System in Transition 27–36 (1975); Brief for American Psychiatric Association as *Amicus Curiae* 11–17.

5. Judge SCHWELB responds that "[t]here is nothing in this record to suggest that the two witnesses were any less qualified to discuss" Melton's dangerousness to others than dangerousness to himself. *Ante* at 900 n. 9. Accordingly, he implicitly acknowledges that the government has proffered no direct evidence that the doctors were qualified to testify about future dangerousness. Furthermore, our caselaw demands that the proffering party must show the expert has sufficient "skill, knowledge, or expe-

rience" in the field to demonstrate that his or her opinion "will probably aid" the fact-finder; the law does not require the other party to provide evidence that the expert is unqualified. *Dyas*, 376 A.2d at 832. Judge SCHWELB, therefore, has the burden of proof reversed by suggesting—erroneously—that if an expert is qualified to address dangerousness to self, he or she must be deemed qualified to opine on dangerousness to others, absent rebuttal to the contrary.

6. Dr. Donald Taylor testified:
    I don't think I have said 'I think, 50–percent chance or 70–percent chance this person will do this or the other thing,' and I—I'm quite willing to concede that I don't think that that's within the state of the art to predict over a long period of time, more than a few days of time, with statistical accuracy, that is, with anything approaching more than 50/50. Even that perhaps is doubtful, so I concede that. I think it's very difficult to predict future behavior beyond a day or two.
    *In re D.L.*, Transcript at 8.

7. Dr. Andrew Schwartz testified that predicting dangerous behavior:
    var[ies] very greatly, from case to case. I personally feel that the whole question of

 

The legislature has, of course, decided that psychiatric evaluation will be useful and sometimes necessary in civil commitment decisions, but I see nothing in the legislative scheme indicating that *every* psychiatrist, by virtue of a credential as such, is qualified to testify as to a particular person's dangerousness to self or others. The trial court accordingly abused its discretion in failing to verify that Dr. Byrd and Dr. Cornet were qualified to opine on Melton's dangerousness.

Respectfully, therefore, I dissent as to both issues presented.

prediction of dangerous behavior is a very uncertain one.... [I]t's very difficult to make predictions about dangerousness or about human behavior in general in a predictive sense. But I think that within the spectrum of uncertainty, if you will, that there are some patients with whom one can be relatively more confident than others.
*In re M.G.*, Transcript at 11.