**Michael K. TEAL, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 07–CF–382.

District of Columbia Court of Appeals.

Argued May 27, 2009.

Decided June 25, 2009.

---

O. Dean Sanderford, Public Defender Service, with whom James Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellant.

Sarah T. Chasson, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III and Chrisellen R. Kolb, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, FISHER and BLACKBURNE–RIGSBY, Associate Judges.

REID, Associate Judge:

■ A jury found appellant, Michael K. Teal, guilty of the lesser-included offense of assault with a dangerous weapon,[1] and carrying a dangerous weapon.[2] He claims, in essence, that the trial court violated his constitutional right to present a defense by failing to find that aspects of the prosecutor's conversations with a potential defense witness caused her to change her mind about providing negative reputation testimony concerning her nephew, the complaining witness and the main government witness against him. We conclude that the record is inadequate for the resolution of the fundamental constitutional issue presented on appeal. Hence, we remand this case to the trial court for (1) factual findings and conclusions concerning whether the government substantially interfered with Ms. Good's decision to testify about her nephew's reputation for untruthfulness and (2) if warranted, a new trial.

## FACTUAL SUMMARY

During Mr. Teal's trial, the government presented the testimony of complaining witness, Robert B. Wilson, as well as that of officers of the United States Secret Service Uniformed Division who were involved in the investigation of Mr. Wilson's complaint of armed robbery. Mr. Wilson testified that around 3:30 a.m. on May 13, 2006, he left the Bravo Club, located near Connecticut Avenue and K Street, in the Northwest quadrant of the District of Columbia. A tall, dark Black man with a bony face (later identified as Mr. Teal) approached him on 17th Street and asked for spare change. Mr. Wilson pretended to be drunk and denied having any change. The man soon pointed a pocket knife (with about a four inch blade) in the direction of Mr. Wilson's abdomen and said "[h]e wasn't messing around." Mr. Wilson pulled out his wallet but ran into the street instead of giving the man any money. The man walked away and Mr. Wilson decided to follow him and to try to find a police officer. When the man saw him, he again pulled out his knife and took steps toward Mr. Wilson, but the man put the knife away and said he "was just joking, or playing." Upon seeing two other men who appeared to be drunk, Mr. Wilson warned them that a man had just pulled a knife on him, and he continued to follow the man. After approaching "a guy" whose head was resting on a plastic bag, the man reached into his clothing, "grabbed something and stuck it in the bag." Mr. Wilson saw a police car and informed the officer (identified as Officer Ryan Monteiro) that a man "had just pulled a knife on [him]."

Officer Monteiro, who was on routine patrol in the area where the assault occurred on May 13, 2006, testified that Mr. Wilson had approached him to complain that "an individual (to whom he pointed) had attempted to rob him at knifepoint." Officer Monteiro drove near Mr. Teal and waited for backup assistance. Three offi-

---

1. The jury acquitted Mr. Teal of the indicted charge of assault with intent to commit a robbery while armed, in violation of D.C.Code §§ 22–401, –4502 (2001).

2. D.C.Code § 22–4504(a).

cers responded, including Sergeant Steve Porter who assisted with the handcuffing of Mr. Teal. Officer Monteiro observed a "7-inch folding knife . . . on the sidewalk, approximately 3–4 feet from [Mr. Teal]," and he observed a homeless man "on the far side of the sidewalk." Mr. Wilson identified the knife as the one used in the alleged robbery.[3] Sergeant Porter did not notice the knife on the sidewalk as he assisted in restraining Mr. Teal, but he heard Mr. Wilson say that Mr. Teal "tried to hide the knife." Mr. Wilson pointed to a bag and Sergeant Porter watched as the homeless person "reached into the bag, grabbed the knife and laid it on the sidewalk."[4] The knife was closed.[5]

The defense presented the testimony of Madeleine Outman, an intern investigator for the defense, for the purpose of casting doubt on Sergeant Porter's testimony about the knife. Ms. Outman did not take notes during her interview with Sergeant Porter, but she prepared a memorandum the following day for defense counsel. She was asked on cross-examination, "Didn't you actually say in your memo . . . that the statement regarding the knife seemed to have been made simultaneously or after the homeless individual had taken the knife and placed it on the sidewalk?" She answered: "Yes. That's what Sergeant Porter indicated." The defense also called Officer Monteiro who agreed that none of the written police reports about the incident contain a statement from Mr. Wilson that the assailant put a knife in the homeless person's bag.[6]

## ANALYSIS

Mr. Teal essentially argues that the prosecutor improperly told a potential defense witness, the aunt of Mr. Wilson (Natalie Good) who was expected to testify about her nephew's reputation for untruth-

---

**3.** When Officer Monteiro first saw the knife, it was closed, but when he showed it to Mr. Wilson, it was open.

**4.** Sergeant Porter's handwritten notes, dated May 13, 2006, state in part:

> S–1 was on the ground and I assisted with cuffing, knife was already on the ground[.] C–1 pointed to knife & advised he saw S–1 hide knife [in] white grocery bag owned by another homeless person[.]

Sgt. Vince Gregory was one of the Secret Service officers who responded to Officer Monteiro's request for assistance. He tried to interview the homeless person but the response he received "was unintelligible." He took a statement from Mr. Wilson and acknowledged that the statement "never mentioned that he saw the person he said tried to rob him put a knife in another man's bag."

**5.** Officer Richard Cockrell, who was assigned to the Crime Scene Search Unit of the Secret Service Uniformed Division, saw a closed knife on the sidewalk when he arrived. He was not able to lift usable latent fingerprints from the knife.

**6.** The record contains a United States Secret Service Uniformed Division Complainant/Wit-

ness Statement signed by Mr. Wilson. The statement does not mention seeing his assailant place the knife in the bag of a homeless man. In addition, Officer Monteiro's affidavit regarding the incident attributes no statement to Mr. Wilson concerning the placement of the knife in a homeless person's bag:

> I, (AO) Officer Monteiro, Ryan of the U.S. Secret Service was flagged down by W–1 at the intersection of 17th Street and "I" Street N.W. W–1 advised that a Black male had approached W–1 in the 1000 block of 17th Street and asked "Do you have any spare change." W–1 replied "No." That is when S–1 [Mr. Teal] pulled a silver knife with the blad[e] open and stated "Quit f* * *king around" and lunged at W–1 with the knife. W–1 walked into the street and kept sight of S–1. W–1 then approached AO's marked police cruiser and pointed out S–1 to AO. AO approached S–1 and ordered S–1 to the ground and placed S–1 in handcuffs. A silver folding knife was located 4 feet away from S–1 on the sidewalk. CSSO responded and printed the knife, getting several partial prints.

fulness, that (a) "[Mr.] Wilson would learn of her testimony," and (b) Mr. Teal had been convicted twice in the past for armed robbery. He asserts that the prosecutor's comments caused Ms. Good to decline to testify and hence violated his constitutional right to present a defense guaranteed by "the Sixth Amendment's Compulsory Process Clause" and by the Fifth Amendment Due Process Clause. He further contends that "the loss of [Ms. Good's] testimony was not harmless," and that the case should be remanded to the trial court for a determination of whether the prosecutor's conversation with Ms. Good was the reason for her decision not to testify.

The government contends that Mr. Teal failed to make a record in the trial court after the trial judge "explicitly asked to hear about any threatening or intimidating statements that the government may have made to [Ms.] Good." The government further maintains that "[d]efense counsel never established (1) how [Ms.] Good's testimony had changed at the time of trial or (2) that her testimony ever was admissible." Consequently, the government argues, because the trial court determined "that the government's contact with [Ms. Good] was not improper," and Mr. Teal failed to make his record, he cannot demonstrate prejudice and no remand is necessary.

We first review the record regarding the proposed defense testimony of Ms. Good. On October 24, 2006, prior to opening statements, defense counsel alerted the trial court, *ex parte*, that it planned to call "a witness who knows the complainant, and she has indicated . . . that she will not be in the same vicinity as [Mr. Wilson]" because "[s]he is afraid of him." The trial judge asserted that the matter would be revisited. At the beginning of the day on October 25, 2006, the trial court inquired generally about the scheduling of the witness, and alerted defense counsel that it "want[ed] to hear what the proffer is, at the end of the day, if [defense counsel] wish[ed] to have [the witness] called." The matter was broached again on the morning of October 26, 2006. Defense counsel notified the trial court (1) about a conversation between the prosecutor and Ms. Good, including the prosecutor's statement that Mr. Teal had two prior convictions for armed robbery and that "[Mr. Wilson] would hear about her testimony and what she said"; and (2) that Ms. Good had denied her earlier statement to the defense that Mr. Wilson "did not have a reputation for truthfulness."[7] Defense counsel moved to dismiss the case.

7. Defense counsel stated:

> As the court knew and government counsel knew yesterday, I intended to call a witness by the name of Natalie Good . . ., who had told both me and my investigator that the complainant in this case, [Mr.] Wilson-and she is his aunt-did not have a good reputation for truthfulness. She was character evidence on the issue of veracity.
>
> I met with her this morning. She is here and she is now saying this is not the case and that is contrary of what she told us on the occasion.
>
> I inquired of her what changed since we talked to her. She said she spoke with [the prosecutor] yesterday. She spoke with him two times. She told me that [the prosecu-

> tor] had told her that the complainant would hear about her testimony and what she said, and then the court knew-and [the prosecutor] knew, based on the issues that we raised yesterday, that this was a reluctant witness.
>
> This is a family member to the complainant, and she was very concerned. And I made a proffer earlier on this case that she had some security concerns.

The trial court reminded defense counsel that "some of those proffers about [Ms. Good's] reluctance were at the bench," and that the court made no inference ("logistical or otherwise") from defense counsel's statement that she was not sure whether the witness would be in court the following day. Defense counsel continued:

The prosecutor expressed outrage at the suggestion that he had intimidated the witness, and he insisted that he spoke to Ms. Good only for the purpose of "find[ing] out ... [Ms. Good's] basis in fact ... for having an opinion as to the reputation for truthfulness and veracity of Mr. Wilson," and that Ms. Good "told [the prosecutor] she had not discussed with anyone [Mr. Wilson's] truthfulness and veracity issues. She had no problem with that [and] [i]t's clear she was not going to be a witness in this case." The prosecutor acknowledged telling Ms. Good that "Mr. Wilson would learn" about her statements, and he explained that he would have to discuss her testimony with Mr. Wilson in order to determine whether there was any proper response or rebuttal. He also informed her that "Mr. Wilson, at this point, thinks she still lives in Florida, and [he] would make ... absolutely sure [sic] that [he] would not disabuse him of that fact [to prevent him from] think[ing] she came up here from Florida[,]" and that "he would not encounter her in any sense, in any way, and [he] would not find out where she is." The prosecutor maintained that Ms. Good's "reluctance to testify is she has nothing to say about this case."

The trial court denied the defense motion to dismiss and said:

> I think the government is free to contact this witness. And if [the prosecutor] told him something that was untrue or otherwise threatened her, or somehow intimidated her, I would certainly want to hear about that. But based on what I have heard, I certainly don't see any motion to dismiss being appropriate.

> I understand. And I am quite concerned because, according to this witness, [the prosecutor] told her my client has two prior convictions for armed robbery.
> This, of course, would not be relevant at all on the issue. She would be testifying about the credibility of the complainant in this

The trial court did not comment on defense counsel's proffer about the prosecutor's disclosure to Ms. Good of Mr. Teal's prior armed robbery convictions. Rather, when defense counsel continued to explain the alleged impact of the prosecutor's conversation with Ms. Good, that is, her fear of Mr. Wilson, the trial court inquired whether it was true that Ms. Good had not lived with Mr. Wilson, her nephew, since 1993 when he was a teenager. Defense counsel responded that Ms. Good's reputation testimony was not solely based on her experience with Mr. Wilson, but that "it is information she has from the family...." Defense counsel also stated, "I am not sure [the prosecutor] accurately reflected Mr. Teal's [criminal] record[,]" and she expressed doubt about the relevancy of that record pertaining to Ms. Good's proposed testimony. The prosecutor took the position that if there was any question about his integrity, he "would ask for a voir dire" of Ms. Good on the record. Defense counsel indicated that her investigator was willing to testify.

The trial judge asked defense counsel if she wished him "to take any further steps in regard to [Ms. Good] or this case." Defense counsel asked for an instruction that Ms. Good would have testified that Mr. Wilson "did not have a good reputation for honesty." The trial court refused to give the requested instruction but told defense counsel that she could call Ms. Good as a witness. Defense counsel again offered the testimony of her investigator who had spoken with Ms. Good "on three separate occasions." The trial judge responded:

> case. I am very concerned this witness now has done a completely one-eighty with respect to what we had spoken to her about previously.
> I am concerned that this witness feels intimidated, and at this point, given her reluctance, I am making a motion to dismiss.

I don't doubt [your investigator] had conversations that may well have led you to believe the testimony might have been a certain way. But [the prosecutor] had conversations that led him to believe the testimony would have been a different way. This is not uncommon with witnesses. If you wish to call the witness, you may obviously do so.

Defense counsel replied, "I can't call her at this point." The trial judge pressed his question saying, "You don't wish to call her?" Defense counsel stated, "Yes, I do not wish to call her."

■■■■ We turn now to the legal principles that guide our analysis. "A criminal defendant's right to present a defense is essential to a fair trial." [8] That right is constitutionally grounded. "The Fifth (or Fourteenth if a state is involved) and Sixth Amendments concomitantly provide a criminal defendant the right to present a defense by compelling the attendance, and presenting the testimony, of his own witnesses." [9] Nevertheless, "the right to present a defense, and its concomitant right to compulsory process, are not unqualified." [10] Consequently, to demonstrate that his right to present a defense has been violated, "a criminal defendant must generally show that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means." [11] That is, a criminal defendant "must at least make some plausible showing of how [the testimony from the proposed witness] would have been both material and favorable to his defense." [12]

Moreover, as the First Circuit has declared: "Causation is an essential building block in the edifice of a sixth amendment claim of this genre[,]" and "there can be no violation of the defense's right to present evidence, we think, unless some contested act or omission (1) can be attributed to the [government] and (2) causes the loss or erosion of testimony which is both (3) material to the case and (4) favorable to the accused." [13]

■■■■ Furthermore, the defense must establish that the government acted improperly, and "[t]he Compulsory Process and Due Process Clauses ... require courts to conduct a searching substantive inquiry whenever the government seeks to

8.  United States v. Serrano, 406 F.3d 1208, 1214 (10th Cir.2005) (citing United States v. Valenzuela–Bernal, 458 U.S. 858, 875, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (O'Connor, J., concurring)).

9.  Serrano, supra note 8, 406 F.3d at 1215 (citing Washington v. Texas, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)); see also Washington v. Schriver, 255 F.3d 45, 56 (2d Cir.2001) ("The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.") (citing Taylor v. Illinois, 484 U.S. 400, 408–09, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)) (other citations omitted); Brown v. United States, 864 A.2d 996, 1003 (D.C.2005) ("The right of a defendant to establish a defense by presenting his own witnesses is a fundamental element of due process of law.") (citations omitted); Reese v. United States, 467 A.2d 152, 155 (D.C.1983).

10.  United States v. Williams, 205 F.3d 23, 29 (2d Cir.2000) (citations and internal quotation marks omitted).

11.  Id. (citation omitted).

12.  Valenzuela–Bernal, supra note 8, 458 U.S. at 867, 102 S.Ct. 3440 (footnote omitted). A criminal defendant "must, at a minimum, demonstrate some plausible nexus between the challenged governmental conduct and the absence of certain testimony." United States v. Hoffman, 832 F.2d 1299, 1303 (1st Cir. 1987).

13.  Hoffman, supra note 12, 832 F.2d at 1303.

exclude criminal defense evidence."[14] The "searching substantive inquiry" is required because "the government cannot substantially interfere with a defense witness's decision to testify."[15] "Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering."[16] Factual findings on the question of substantial interference are necessary "[b]ecause the existence of substantial interference is a factual question."[17] And, "[t]he circumstances will warrant reversal only if the government's conduct interfered substantially with a witness's free and unhampered choice to testify."[18]

The government, of course, was free to contact Ms. Good, and appellant does not contend otherwise. However, after examining the record in this case in light of the legal principles set forth above, we conclude that the record is inadequate to determine whether the government substantially interfered with Mr. Teal's Fifth and Sixth Amendment fundamental constitutional right to present a defense by calling the aunt of the complaining witness to testify about his reputation for untruthfulness. Mr. Wilson was the primary government witness against Mr. Teal and testimony by a family member with whom he had apparently lived in the past which cast doubt on his veracity would have been material and favorable to the defense, perhaps even outcome-determinative.[19] However, the record is devoid of factual findings by the trial court that are essential to determine whether the prosecutor, through "intimidation or coercive badgering,"[20] said something to Ms. Good on one or both of the occasions he spoke with her to actively discourage her from testifying.

While the government faults defense counsel for failing to make an adequate record, we are satisfied that defense counsel made at least a minimal or plausible showing sufficient to trigger a "substantive inquiry"[21] by the trial court to find out whether the government substantially interfered with Mr. Teal's constitutional right to present a defense. Although we discern no obvious effort on the part of the prosecutor to exclude the testimony of Ms. Good, substantive inquiry and factual findings are appropriate and in our view essential given (1) categorical statements by the prosecutor ("[I]t's clear she was not going to be a witness in this case"; Ms. Good's "reluctance to testify is she has

14. *Taylor, supra* note 9, 484 U.S. at 423, 108 S.Ct. 646.

15. *Serrano, supra* note 8, 406 F.3d at 1215.

16. *Id.* at 1216 (citations omitted). Mr. Teal urges us to follow a standard articulated by the California Supreme Court: "In order to establish a violation of his constitutional compulsory-process right, a defendant must demonstrate misconduct ... [but] he need show only that the [governmental] agent engaged in activity that was wholly unnecessary to the proper performance of his duties and of such a character as to transform ... a willing witness to one who would refuse to testify." *In re Martin*, 44 Cal.3d 1, 241 Cal.Rptr. 263, 744 P.2d 374, 393 (1987) (citations and internal quotation marks omitted). We believe the legal principles announced by the federal courts and set forth above are more precise and manageable, and hence, we decline to follow the broad standard enunciated in *Martin*.

17. *United States v. Pinto*, 850 F.2d 927, 932 (2d Cir.1988) (citation omitted).

18. *Id.* (internal quotation marks and citation omitted).

19. *See Valenzuela–Bernal, supra* note 8, 458 U.S. at 867, 102 S.Ct. 3440.

20. *Serrano, supra* note 8, 406 F.3d at 1216.

21. *See Taylor, supra* note 9, 484 U.S. at 423, 108 S.Ct. 646.

nothing to say about this case") during the colloquy with the trial judge; and (2) unanswered questions in the face of conflicting statements by defense counsel and the prosecutor as to whether Ms. Good, albeit reluctantly, had agreed to be a defense witness prior to the prosecutor's conversations with her, and the need to reconcile these divergent views.[22]

Furthermore, on this record we do not have enough information to appreciate fully the context in which the prosecutor told Ms. Good that Mr. Wilson, the complaining witness, would learn about her conversations with him, that Mr. Wilson thought she was still in Florida, and he would not find out where she is. Nor do we know the circumstances under which the prosecutor revealed that Mr. Teal, the defendant, had two prior convictions for armed robbery. Equally important, we do not know, precisely, what Ms. Good said to the defense investigator or defense counsel about Mr. Wilson's reputation for truthfulness and whether her testimony would be based primarily on her contact with him up to sometime in 1993, or whether she planned to convey his reputation within the family circle beyond 1993, and if so, the basis of her knowledge. Indeed, we cannot determine whether Ms. Good's testimony even would have been admissible at trial.

Were this a case in which the government had presented substantial and compelling testimonial evidence of Mr. Teal's guilt, other than that provided by Mr. Wilson, or physical evidence (such as Mr. Teal's fingerprints on the knife) clearly connecting him to the indicted offenses, and if there were no controversy about

whether Mr. Wilson saw Mr. Teal place the knife in the bag of a homeless person, we might be able to assume error and to resolve the case on a harmless error basis, without a remand. However, the government's case against Mr. Teal was not particularly strong without the testimony of Mr. Wilson, and during oral argument, government counsel candidly stated that "the case was not overwhelmingly strong."[23] Moreover, given the gaps in the record as noted, we are loathe to attribute good or bad motives to the prosecutor or defense counsel, or to attempt a harmless error analysis.

Accordingly, for the foregoing reasons, we are constrained to remand this case to the trial court for (1) factual findings and conclusions concerning whether the government substantially interfered with Ms. Good's decision to testify about her nephew's reputation for untruthfulness and (2) if warranted, a new trial.

*So ordered.*

---

**22.** *See Pinto, supra* note 17, 850 F.2d at 933 (discussing the parties' differing perceptions of a prosecutor's interviews with a witness and the responsibility of the trial judge "for reconciling disparate views of the evidence.").

**23.** In response to a question from the bench as to whether the character testimony could have been "outcome-determinative," government counsel replied: "This case was not overwhelmingly strong. It was a one witness case.... We had a very solid, repeated identification."