Jonathan M. AUSTIN, Appellant,

v.

UNITED STATES, Appellee.

No. 11–CF–186.

District of Columbia Court of Appeals.

Argued Jan. 16, 2013.

Decided April 18, 2013.

414

Billy L. Ponds, Washington, DC, for appellant.

Peter S. Smith, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman and Suzanne Grealy Curt, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and THOMPSON, Associate Judges, and WAGNER, Senior Judge.

WAGNER, Senior Judge:

Following a jury trial, appellant, Jonathan Austin, was convicted of one count of first-degree felony murder with aggravating circumstances (D.C.Code §§ 22–2101 & –2104.01(b)(4)) and one count of cruelty to children (D.C.Code § 22–1101). He argues for reversal on the grounds that the trial court erred in: (1) precluding the cross-examination of a key government witness; (2) depriving him of his constitutional right to present a defense; (3) not excluding the testimony of the Chief Medical Examiner for the District of Columbia; and (4) denying his motion for a new trial. Finding no reversible error, we affirm.

### I.

The charges against appellant arose out of the death of Ronjai Butler, a 21–month old child, who died on November 16, 2008 at Howard University Hospital. The government's evidence showed that before his death, Ronjai was living with his mother, Michelle Butler, and his 35–month old sister, Ja.B., in an apartment on North Capitol Street. Appellant, Ms. Butler's boyfriend, had been living with her for about one year. The relationship had soured, and Ms. Butler asked him to move and had stopped making his car payments. Shortly before noon, Ms. Butler left the apartment to run errands with her daughter, 13–year old J.D., who lived with her only on weekends. According to the testimony of Ms. Butler and J.D., Ronjai was playing and acting normally when they left. When they returned home less than an hour later, the child was on the bed, crying, and "struggling" to breathe. A short time later, the child became unresponsive, and appellant suggested putting the child in a tub of cold water. The child tried to stand, and appellant pushed him back into the tub by the waist. J.D. testified that she saw bruises on the child's face, arms, chest, legs, and stomach. When Ms. Butler splashed cold water on the child, he began to cry, and shortly thereafter he stopped breathing.

Ms. Butler and appellant took Ronjai to Howard University Hospital. When they arrived at the hospital, the child had no pulse. The hospital staff performed cardiopulmonary resuscitation (CPR) by compressing the middle of his chest, but they could not resuscitate him. Appellant told

Ms. Butler that the doctors said that Ronjai had suffered a heart attack.

The government presented evidence that appellant was observed later banging his head against the wall and saying that he would be blamed for the child's death. A worker at the day care center that the child attended until one month before his death testified that appellant frequently picked the child up from the center and that Ronjai was afraid of appellant. She testified that she asked appellant why Ronjai resisted going with him, and appellant said that they did not get along and that Ronjai gave him a hard time.

Dr. Marie–Lydie Pierre–Louis, the Chief Medical Examiner for the District of Columbia, conducted the autopsy for the child. She testified that Ronjai, who was 30 inches tall and weighed 26 pounds, had bruises on his forehead and skull that occurred three or four hours before his death was pronounced at 4:10 p.m., and numerous abrasions less than 24 hours old. She testified that he had complex, depressed fractures of the skull that caused his brain to swell, eventually causing his breathing and heart to stop. She testified that the child had other serious injuries, including rib fractures and lacerations to his spleen and liver. Dr. Pierre–Louis determined that the cause of Ronjai's death was multiple blunt-impact trauma, including skull fractures, contusions, and lacerations of his internal organs with internal hemorrhage. She determined that the manner of death was homicide. She found that Ronjai did not have asthma, that he was not suffering from acute pneumonia, and that he had no abnormalities in his heart or lungs.

Dr. Stanton Kessler, a board-certified pathologist, testified as an expert witness for the defense. He rendered an opinion that Ronjai's skull fractures occurred after his death. He also testified that the injuries to the child's liver and spleen and one rib fracture were caused by the administration of CPR improperly at the hospital. Dr. Kessler testified that Ronjai had severe pneumonia that caused his breathing problems and that he died as a result of bronchial pneumonia with sepsis.

Dr. Sarah Colvin, a board-certified neuropathologist and Deputy Chief Medical Examiner examined Ronjai's skull and brain, and she reviewed the autopsy report and Dr. Kessler's report. She concluded that Ronjai suffered a depressed skull fracture that caused an intra-dural hemorrhage resulting in bleeding and swelling in his brain which depressed his heart and lung functions, eventually leading to his death. She concluded that the multiple bruises on the child occurred while he was alive and that his injuries could not have resulted from CPR. She noted that CPR would not leave knuckle and wristwatch impressions that could be seen in the bruises on Ronjai's chest.

## II.

Appellant argues that the trial court committed constitutional error in denying his request to cross-examine a government witness, Ms. Butler, on an issue of bias. Specifically, he contends that the trial court precluded him from questioning Ms. Butler concerning an investigation by the Child and Family Services Administration (CFSA) into assault and other allegations made against her by her daughter, J.D. Appellant argues that the trial court's ruling precluded him from exposing Ms. Butler's motive for currying favor with the government and reasons for inconsistencies between her trial testimony and pretrial statements. The government responds that appellant did not advance this bias theory in the trial court, never attempted to cross-examine Ms. Butler about the investigation, and did not object

to the court's rulings related to Ms. Butler's cross-examination. The government contends that, in any event, the CFSA investigation was properly excluded as a collateral matter because it was unrelated to the death of Ronjai Butler, and the case involving J.D., Ronjai's sister, had been closed approximately one year earlier.

## A. Generally Applicable Legal Principles

"The Sixth Amendment grants an accused the right to confront and cross-examine the government's witnesses against him." *Gardner v. United States,* 698 A.2d 990, 996 (D.C.1997) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (other citations omitted). This important right is the accused's principal means for testing the credibility of a witness against him or her. *Gaines v. United States,* 994 A.2d 391, 399 (D.C.2010) (citing *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). Since exposure of a witness' biases or motives for not telling the truth is a major function of cross-examination, bias is " 'always a proper subject of cross-examination,' " which takes on " 'enhanced significance where the credibility of the key government witness is in issue.' " *Gardner,* 698 A.2d at 996 (quoting *Jenkins v. United States,* 617 A.2d 529, 531 (D.C.1992)). However, the trial court "retain[s] wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431.

## B. Analysis

The record supports the government's assertion that appellant did not raise in the trial court the bias challenge that he presents on appeal. Initially, the issue concerning the CFSA investigation was raised by the government in connection with the anticipated testimony of J.D., not Ms. Butler. Prior to trial, the government filed a "Motion to Preclude Cross-Examination of Witness Concerning Alleged Suicidal Ideation" in which it sought to preclude appellant from cross-examining J.D. concerning her alleged suicidal ideation. In its motion, the government explained that on December 5, 2007, J.D., the victim's sister, told one of her teachers that she was being forced to care for her younger siblings, that her mother had thrown a phone at her in the past and threatened to beat her, and that she planned to kill herself. CFSA investigated the allegations, but it closed the case because it found inconclusive the allegation that Ms. Butler hit J.D. and no indication that J.D. was mentally ill or being forced to babysit. Therefore, the government argued that the allegations involved in the CFSA investigation were irrelevant because they occurred before the victim in this case "arrived on the scene," and "because there is no indication of false statements by J.D. or any mental illness that would have any impact on the credibility of her testimony."

When the parties addressed the matter with the court during trial, defense counsel explained his theory for cross-examining Ms. Butler in this area as follows:

It is relevant because ultimately the evidence in the case is going to come down to whether the child[, Ronjai,] was struck in the head.... [W]hether Ms. Butler struck the child in the head or whether someone else who was present in the home struck the child in the head. It goes to her credibility, because it has been alleged that she struck another child in the head.

The trial court remarked that this appeared to be like other crimes evidence that the defense was seeking to use improperly to show propensity. The following colloquy ensued between the court and counsel:

> Defense Counsel: ... I am not going to get into the whole investigation—is whether or not her mother has ever struck her in the face. Because the mother has a reason to testify in a fashion to make it appear that Mr. Austin is responsible for this, because she is aware that if she was the person who, in fact, struck [her daughter] in the face and this allegation has been raised before about her, then she would appear to be the more culpable suspect.

> Prosecutor: But it was never raised about this child, ... as to—whether striking [J.D.] in the face and [J.D.] says that, that may be a separate issue than bringing up a neglect position.

> The Court: Right. It seems to me that you're entitled maybe to ask [J.D.] if her mother ever struck her in the head or face. But I don't think you can then go into the neglect issue.

> Defense Counsel: That I would agree with. Would the court permit me to also ask Ms. Butler that question, that single question, did she ever strike [J.D.] in the face?

The prosecutor said that he had no objection to the question, but that if Ms. Butler denied striking J.D., he would object to defense counsel inquiring about whether there had been an investigation into the allegation by CFSA. Defense counsel had already indicated that he had no intention of doing so and that he agreed with that limitation. The trial court then expressed its agreement, and defense counsel responded, "If that is the Court's ruling, then I will abide by that ruling."

On appeal, appellant argues that the trial court's ruling prevented him from showing Ms. Butler's bias based on the theory that she sought to curry favor with the government in order to avoid prosecution for allegedly striking her daughter, which had been the subject of CFSA's investigation. He also contends that this line of cross-examination would have exposed the reason for inconsistencies between Ms. Butler's pre-trial statement and her trial testimony, thereby undermining her credibility. The government responds that appellant's challenges are subject to plain error review because he failed to disclose the bias theories he now advances to the trial court.

■ To avoid plain error review, "[o]bjections must be made with reasonable specificity; the [trial court] must be fairly apprised as to the question on which [it] is being asked to rule." *Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992). As the discussions previously described show, appellant made no argument, proffer, inquiry, or objection that would have suggested to the trial court the bias theories he now advances. At that time, the defense theory was that by showing that Ms. Butler had struck her daughter in the past, the defense could establish that she was the more likely suspect for striking the blows that led to her son's death. At the same time, defense counsel disclaimed any intention to inquire of Ms. Butler about CFSA's investigation of her daughter's assault allegation. As defense counsel requested, the trial court ruled that he could ask J.D. whether her mother had ever struck her and ask Ms. Butler whether she had ever struck her daughter. At trial, defense counsel asked

Ms. Butler and J.D. those questions.[1] However, he did not attempt to cross-examine Ms. Butler about CFSA's investigation nor reveal the bias theories he now pursues on appeal. Since appellant did not preserve his claims of error, we review only for plain error.[2]

■ Under the plain error standard, appellant must show error that is plain and that such error affected substantial rights. *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). A reversal under the plain error standard will be granted only in exceptional circumstances, *i.e.,* where the error is " 'so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial.' " *Harris v. United States,* 602 A.2d 154, 159 (D.C.1992) (en banc) (quoting *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc)) (other citations omitted). Appellant cannot meet that standard here.

■ Appellant contends that the trial court deprived him of his constitutional right to establish bias on the part of the witness, Ms. Butler, based on the CFSA investigation into allegations of abuse and neglect made by her daughter. The government argues that evidence concerning the investigation would have been properly excluded as an irrelevant, collateral matter because it made no finding related to Ronjai's death and was closed one year prior thereto.

■ While evidence of bias of a principal prosecution witness is a proper subject of cross-examination, the proposed area for questioning must meet relevancy standards. *Barnes v. United States,* 614 A.2d 902, 905 (D.C.1992) (citing *Porter v. United States,* 561 A.2d 994, 996 (D.C.1989)). Specifically,

> [t]he party posing the question must proffer to the court some facts which support a genuine belief that the witness is biased in the manner asserted, that there is a specific personal bias on the part of the witness, and that the proposed questions are probative of bias.

*Id.* (internal quotation marks omitted). Here, appellant did not meet this foundational requirement. There was a showing that Ms. Butler's daughter made allegations against her that resulted in an investigation by CFSA. However, appellant does not dispute that CFSA closed the case three years before appellant's trial upon finding "inconclusive" the allegation that Ms. Butler hit her daughter and no

---

1. While J.D. was in the witness stand, defense counsel advanced two theories for inquiring about whether the reason that she was staying with her father was related to her accusation against Ms. Butler that was the subject of CFSA's investigation. Counsel explained these as follows: "Maybe the mother struck [Ronjai] or the alternative theory is that [J.D.] fabricated against the mother and that she is not a truthful witness, which goes to her credibility." However, neither theory forms the basis for the issues raised by appellant on appeal.

2. This case is unlike *Dawkins v. United States,* 41 A.3d 1265 (D.C.2012). In *Dawkins,* appellant argued that the trial court erred in precluding his cross-examination of the arresting officer, during a suppression hearing, about a civil suit against him for false arrest before hearing a proffer on its relevance. *Id.* at 1267. This court rejected the government's argument that Dawkins failed to preserve the issue by failing to raise it a second time because the trial court had made it clear throughout the hearing that it would not consider questioning about facts outside of the issue of consent. *Id.* at 1269–70. In the case now under consideration, counsel did not attempt to pursue the line of questioning nor attempt to make a proffer about the bias issues he now raises. Unlike *Dawkins,* there was no indication that the trial court was impatient or would have been unwilling to consider the argument if appellant had made it.

evidence that Ms. Butler mistreated the younger children in any way. Appellant offered no basis for showing that Ms. Butler feared prosecution because of this old investigation or had the need to curry favor with the government for that reason. Appellant did not show in the trial court, nor even provide on appeal, a factual basis for inquiring into the CFSA investigation or its relationship, if any, to the issues involved in his trial. CFSA itself found inconclusive the allegation that Ms. Butler struck her daughter and closed the case without pursuing neglect and abuse proceedings almost a year before the events leading to Ronjai's death. Appellant made no proffer that Ms. Butler had reason to believe that the case would be reopened. Absent is any factual predicate supporting a genuine belief that Ms. Butler was biased in favor of the government out of fear that she might be prosecuted for her alleged prior assault on J.D. *See Porter, supra,* 561 A.2d at 996 (noting that the party seeking to cross-examine for bias "must proffer to the court some facts which support a genuine belief that the witness is biased in the manner asserted."). Appellant failed to provide such a proffer. Therefore, the trial court acted within its discretion in limiting cross-examination into an area temporally and factually unrelated to the issues on trial and the alleged bias. Since there was no abuse of discretion, there obviously was no plain error.

Appellant contends that the trial court's ruling excluding evidence concerning CFSA's investigation prevented him from showing the reason for inconsistencies between Ms. Butler's trial testimony and her statement to the police right after Ronjai's death. Given the outcome of the investiga-

tion and its temporal relationship to the crime, we are not persuaded that exploration of this collateral issue, even if admissible, would have assisted appellant in showing the reasons for any inconsistencies in Ms. Butler's testimony. In any event, the trial court did not limit defense counsel's cross-examination of Ms. Butler concerning inconsistencies between her statement and trial testimony. The defense elicited from her that initially she told the police that she did not believe appellant had done anything wrong and that her testimony changed after she spoke to the police. The defense introduced Ms. Butler's videotaped interview in which she first told the police that the child had fallen which the defense argued was inconsistent with her testimony that appellant was responsible for his injuries. For all of the foregoing reasons, we find no abuse of discretion in the trial court's ruling limiting cross-examination about the CFSA investigation, and therefore, clearly no plain error.[3]

■■■■ Appellant suggests that he should have been permitted to use the evidence surrounding the CFSA investigation into the alleged assault to show that Ms. Butler abused one of her children, and therefore, must be responsible for the abuse inflicted upon Ronjai. " '[A] witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction only where (1) the examiner has a factual predicate for the question, and (2) the bad act bears directly upon the veracity of the witness in respect to the issues involved [i]n the trial.' " *Wagner v. Georgetown Univ. Med. Ctr.,* 768 A.2d 546, 562 (D.C.2001) (quoting *Portillo v. United States,* 609 A.2d 687, 690–91 (D.C.1992)).

---

**3.** Appellant does not argue that cross-examination in this area should have been allowed under a *Winfield*-type theory, *see Winfield v. United States,* 676 A.2d 1 (D.C.1996), or as

reverse-*Drew* evidence. *See Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). Therefore, we do not consider any such argument.

Use of prior bad acts evidence to show propensity is impermissible, as the trial court pointed out. Although a witness may be impeached by inquiries into prior bad acts relevant to credibility, "[g]enerally speaking, a party cannot present evidence that a person acted in a certain fashion on a prior occasion in order to show conformity with that behavior in a later setting." *Brown v. United States,* 726 A.2d 149, 153 (D.C.1999) (citations omitted). In this case, not only did appellant fail to meet the foundational requirements for eliciting evidence of prior bad acts, but he sought to pursue this line of inquiry for the impermissible purpose of showing propensity. Under the circumstances, we find no abuse of discretion in the trial court's ruling.

### III.

Appellant argues that the trial court deprived him of the right to present a defense. Specifically, he contends that the trial court improperly limited the testimony of his expert witness, thereby precluding him from explaining (1) that he disagreed with the Chief Medical Examiner's testimony that the cause of Ronjai Butler's death was a homicide and (2) that the child's injuries occurred post-mortem. The government argues that the excluded testimony was inadmissible, and the error, if any, was harmless.

### A. Factual Background

One of appellant's defenses was that Ronjai Butler died of natural causes. Dr. Stanton Kessler testified as an expert witness for the defense.[4] During his testimony, the trial court sustained two objections by the government to his testimony. Dr. Kessler had testified that some of the marks on the child's face as shown in defense exhibit No. 8 were not bruises resulting from a slap or beating, but "purpuric rash" that he opined were from pneumonia that had become septic. The first objection occurred when Dr. Kessler testified about marks on the child's face that appeared on defense exhibit No. 9. Dr. Kessler started to testify about how he would have conducted the autopsy in order to confirm whether the marks on the child's face occurred post-mortem. The part of the examination that prompted the government's objection proceeded as follows:

> Defense Counsel: ... [H]ave you made any findings based on review of Defendant's Exhibit number 9?
>
> Dr. Kessler: Yes.
>
> Defense Counsel: And can you tell me what those findings are?
>
> Dr. Kessler: Those are marks that would be suspicious for pre-mortem marks. You're not sure. So what I would have done in this case is taken a scalpel and cut into it and pulled it open and looked to see if there is actual hemorrhage in the underlying muscle and underlying skin, because the skin will bleed deep if it is hemorrhaged.
>
> Defense Counsel: ... [I]f you did that procedure and there was hemorrhaging, what would the hemorrhaging tell you?

The government objected on the ground that the opinion attacking the autopsy procedure, rather than the actual finding, went beyond the scope of what the defense had set forth in its disclosure statement. Defense counsel conceded as much, but

---

4. Dr. Kessler testified that he is an associate professor at University of South Carolina Medical School. He recounted his extensive training and experience, including that he was board certified in forensic and anatomic pathology in 1987 and re-certified in the latter in 2005. He was offered and accepted in this case as an expert in forensic pathology just as he had been previously about four hundred times.

argued nevertheless that the expert should be allowed to provide the opinion. The trial court sustained the objection and instructed the jury to disregard the question and the answer.

The second objection in issue that was sustained by the trial court came during Dr. Kessler's testimony concerning the cause of fractures to Ronjai's ribs. Dr. Kessler testified that the child had three fractured ribs, two of which occurred before death, and one that happened post mortem. In response to a question seeking his opinion as to how the three fractures occurred, Dr. Kessler responded:

> It was trauma of some sort. I don't know how they occurred, but any kind of trauma. It could have been from a fall, from someone hurting the child, an older sib, who knows.

The government did not object to the foregoing question and answer. Subsequently, Dr. Kessler again testified that only one of the three fractures occurred post mortem, while the other two occurred six to ten weeks before death. Defense counsel then asked the doctor again, "what do you believe caused the fractures of the ribs." The government objected, contending that the answer called for conjecture and lacked foundation. The trial court sustained the objection. However, Dr. Kessler later testified, without objection, that post mortem rib fractures can be caused by compression of the chest during CPR. As previously mentioned, there was evidence that CPR was administered to the child in this case.

## B. Discussion

■ Appellant argues that the trial court denied him the opportunity to present a defense when the court sustained the two government objections above-described during his expert witness' testimony. It is fundamental that a criminal defendant has a constitutionally based right to present a defense. *Teal v. United States,* 974 A.2d 262, 268 (D.C.2009). However, this right is not unqualified. *Id.* "The accused does not have an unfettered right" to introduce evidence that is "inadmissible under standard rules of evidence." *Heath v. United States,* 26 A.3d 266, 276 (D.C.2011) (citing *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). The evidence presented must be relevant, as " 'there is no constitutional right to present irrelevant evidence.' " *Roundtree v. United States,* 581 A.2d 315, 321 (D.C.1990) (quoting *Gibson v. United States,* 536 A.2d 78, 82 (D.C.1987)).

■ Appellant's first challenge to the trial court's evidentiary ruling occurred when it precluded the defense expert from testifying about an opinion not disclosed in compliance with Super. Ct. Crim. R. 16(b)(1)(c). Under circumstances specified in the rule, a defendant is required to "disclose to the government a written summary of the testimony of any expert witness that the defendant intends to use as evidence at trial." The summary must "describe the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications." [5] *Id.* Appellant does not challenge that disclosure requirements were triggered by Rule 16 and that he filed a statement in compliance with it.

---

5. The purpose of this disclosure rule is to " 'minimize surprise that often results from unexpected expert testimony, [to] reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merits of the expert's testimony through focused cross-examination.' " *Ferguson v. United States,* 866 A.2d 54, 63 (D.C.2005) (quoting Fed. R. Crim. P. Advisory committee's notes regarding 1993 amendments to Fed.R.Crim.P. 16(a)(1)(E) that has comparable disclosure requirements for the government).

He did not contend in the trial court, and has not contended on appeal, that his Rule 16 statement included that the expert would offer an opinion about how the autopsy should have been performed.

When a party does not meet the disclosure requirements of Rule 16, the court may, among other sanctions, preclude the party from introducing the undisclosed evidence. Super. Ct. Crim. R. 16(d)(2). We review the trial court's ruling precluding the evidence under the rule for an abuse of discretion. *Murphy–Bey v. United States*, 982 A.2d 682, 689 (D.C. 2009). Here, the trial court first reviewed appellant's disclosure statement and determined that the opinion sought had not been disclosed. After defense counsel agreed, the trial court sustained the government's objection to the testimony. The defense offered no reason for the failure to disclose this opinion in his Rule 16 statement and provided no persuasive argument for allowing the previously undisclosed opinion. Under the circumstances, we perceive no abuse of discretion in the trial court's ruling.[6]

Appellant also argues that the trial court erred in sustaining an objection by the government that prevented Dr. Kessler from testifying concerning whether the child's rib fracture occurred before or after death. This evidence, he contends, would have negated the theory that appellant caused the child's injuries and death. However, the record shows that Dr. Kessler did testify that Ronjai sustained two rib fractures that occurred six to ten weeks before his death, and one that occurred after his death. Appellant directs the court to another portion of the transcript in which the court sustained an objection to the question, "what do you believe caused the fractures of the ribs." The government objected that the answer called for speculation, and in response to further argument by defense counsel, the prosecutor explained that appellant was seeking a legal explanation rather than a medical one. The trial court sustained the objection. Appellant's complaint about this ruling is not entirely clear. On one hand, to the extent that appellant challenges the trial court's ruling on the question concerning the cause of all the rib fractures, that question had been asked and answered. Dr. Kessler had testified previously, "I don't know how [the fractures] occurred, but any kind of trauma. It could have been from a fall, from someone hurting the child, an older sib, who knows." If, on the other hand, counsel's later repetition of the question had reference to the post-mortem fracture only, this question was also answered.[7] Defense counsel was able to elicit from Dr. Kessler that post-mortem fractures can be caused by compression of the chest and that chest compression occurred at the hospital in this case. Even if there was error in the trial court's ruling, it was harmless because appellant in fact elicited the evidence from Dr. Kessler.

## IV.

Appellant argues that the trial court erred in allowing the Chief Medical Examiner, Dr. Pierre–Louis, to testify as an expert witness because she did not

---

**6.** Appellant does not argue that the trial court should have considered some other sanction under Rule 16(d)(2) (*e.g.,* an order allowing discovery or a continuance). He argued in the trial court and on appeal only that the trial court should have allowed the testimony in spite of its omission from appellant's Rule 16 statement.

**7.** This is not entirely clear because counsel phrased the question using the plural form for fractures, and Dr. Kessler testified that there was only one post-mortem fracture.

meet the statutory qualifications for her position. He contends that the applicable statute requires the Chief Medical Examiner to be board certified in forensic pathology, and she is not. The government responds that the version of the statute in effect at the time of appellant's trial allowed a waiver of this requirement, which was granted for Dr. Pierre–Louis. The government contends that, in any event, the trial court did not abuse its discretion in allowing her to testify as an expert witness based upon her training and experience.

We consider first appellant's statutory argument. In support of his argument for exclusion of Dr. Pierre–Louis' testimony, appellant relies on D.C.Code § 5–1402. This statute provides for the Mayor to "nominate, with the advice and consent of the [District of Columbia] Council, the Chief Medical Examiner ("CME")...." D.C.Code § 5–1402(b) (2001 as amended). Subject to an exception hereinafter described, subsection (c)(2) of this statute provides that any CME or Deputy CME "shall be certified in forensic pathology by the American Board of Pathology or be eligible for such certification." An exception provides that "[t]he [Board] certification requirement ... may be waived by the Mayor for the CME appointed to fill the term beginning May 1, 2007, and ending on April 30, 2013." D.C.Code § 5–1402(c)(3).

It is undisputed that Dr. Pierre–Louis was not certified in forensic pathology by the American Board of Pathology. However, she testified at trial that the Mayor waived this requirement to allow her to fill the position.[8] The evidence adduced, which was not refuted, brings her within the statutory exception. Therefore, even assuming that failure to meet the statutory certification requirement could form a basis for precluding the Chief Medical Examiner for the District from qualifying to provide expert testimony, an issue that we need not and do not decide, appellant's argument fails because the evidence established that a waiver, as permitted by law, had been granted.

In any event, the trial court determined that Dr. Pierre–Louis' experience more than qualified her to testify as an expert in the field of forensic pathology. Dr. Pierre–Louis, a licensed physician, testified that she had worked in the Office of the Chief Medical Examiner since 2003, later becoming Acting and then Chief Medical Examiner. She testified that she had performed more than 5,000 autopsies, had seen about 25,000 autopsies performed, and had qualified to testify over 600 times as an expert in forensic pathology in state and federal courts, including, the Superior Court of the District of Columbia and other courts in the District, Maryland, and Virginia. After completing medical school, Dr. Pierre–Louis' training included a three-year residency in internal medicine, a one-year fellowship in gastroenterology, a four-year residency in anatomic and clinical pathology at Howard University Hospital, and a one-year fellowship in the Office of the Chief Medical Examiner.

To qualify to testify as an expert witness, " 'the witness must have suf-

---

8. Dr. Pierre–Louis testified that the Mayor and the Council waived the requirement; however, there is no statutory requirement that the Council also waive the requirement. Of course, it was the Council that enacted the waiver provision into law. *See* D.C.Code § 5–1402, Historical and Statutory Notes (2012 Supp.) (citing the Legislative History of D.C. Law 18–88, which became effective December 10, 2009, and the earlier temporary amendments to the same effect). The Council also had to approve her appointment to the position. *See* D.C.Code § 5–1402(b) (as amended).

ficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier [of fact] in [its] search for the truth.'" *Joyner v. Estate of Johnson,* 36 A.3d 851, 859 (D.C.2012) (quoting *Dyas v. United States,* 376 A.2d 827, 832 (D.C. 1977)). The trial court has broad discretion in determining whether to admit expert testimony, and its ruling thereon will not be reversed unless "'manifestly erroneous.'" *See id.* (quoting *Green v. United States,* 718 A.2d 1042, 1050 (D.C.1998)) (other citation omitted). Similarly, whether a proffered expert has sufficiently qualified as an expert in the field is within the trial court's discretion. *In re Melton,* 597 A.2d 892, 897 (D.C.1991).

 In this case, the trial court did not abuse its discretion in finding Dr. Pierre–Louis qualified as an expert in forensic pathology. This physician had extensive experience in performing autopsies and determining cause of death over many years. The relevant knowledge for eligibility to testify as an expert may be based on experience. *Joyner, supra,* 36 A.3d at 859 (citing *Jones v. United States,* 990 A.2d 970, 979 (D.C.2010)) (other citation omitted). Moreover, it is well-settled that a physician may be qualified to testify as an expert witness even if he or she is not a specialist in the particular field in which he or she testifies. *Melton, supra,* 597 A.2d at 897 (citing *Baerman v. Reisinger,* 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966)). Thus, Dr. Pierre–Louis' lack of board certification in forensic pathology is not a bar to her qualification to testify as an expert in this area. Therefore, we find no abuse of discretion in the trial court's ruling allowing her to testify as an expert witness.

## V.

Appellant argues that the trial court abused its discretion in denying his motion for a new trial where a photograph, which had not been admitted into evidence, was sent to the jury room during deliberations. He contends that this exhibit substantially influenced the jurors' decision and caused them to change their minds about considering another possible suspect. While acknowledging that the exhibit was inadvertently provided to the jury, the government argues that it was virtually identical to other admitted photos that were provided to the jury and that it did not sway their verdict.

### A. Factual Background

Appellant's reference to the jurors' consideration of another suspect arose from a note the jury sent to the court just prior to adjournment for the Thanksgiving recess on November 23, 2010. The note stated, "[a]re we allowed to consider an alternative explanation with respect to another suspect not alluded to in the trial." A response to the note was deferred for consideration until November 29, 2010, when deliberations were scheduled to resume. On that morning, deliberations resumed at 9:30 a.m., and the jury sent another note at 10:06 a.m. which stated, "[w]e would like to withdraw our questions." The jury sent another note, at 10:21 a.m., informing the court that it had reached a verdict, and thereafter delivered its verdict, finding appellant guilty of first-degree felony murder with aggravating circumstances and first-degree cruelty to children.

By letter dated November 30, 2010, the trial judge wrote defense counsel and the prosecutor stating the following:

> It has come to the court's attention that Government's Exhibit 2, a copy of which is attached, was sent back to the jury for consideration despite not being moved into evidence. In addition, the court's records show Government's Exhibit 13

was admitted into evidence, however, it appears that the Exhibit was not sent back to the jury.

Government's Exhibit 2 is a photograph of the minor victim taken at the hospital after his death. Based on this development, appellant filed a motion for new trial pursuant to Super. Ct. Crim. R. 33. In that motion, he argued that Exhibit 2 substantially influenced the jury's deliberations, resulted in the jury not considering another suspect, and generally was prejudicial to him. The government opposed the motion, contending that the exhibit was passed on inadvertently by both parties, that it was cumulative and otherwise admissible, and that it added nothing to the case that would otherwise sway the jury. The trial court denied the motion.

## B. Discussion

 We review the denial of a motion for a new trial for an abuse of discretion. *Porter v. United States*, 826 A.2d 398, 414 (D.C.2003). Under Super. Ct. Crim. R. 33, "the court may grant a new trial to the defendant if the interests of justice so require." The standard for determining whether the inadvertent submission of an exhibit to the jury amounts to prejudicial error is whether the jury's judgment was substantially swayed by its presence in the jury room. *Moore v. United States*, 927 A.2d 1040, 1063 (D.C. 2007) (citing *Vaughn v. United States*, 367 A.2d 1291, 1295 (D.C.1977)).

 The government contends, and appellant does not dispute, that Exhibit 2 was given to the jury inadvertently. The government concedes that this was error.

It argues, however, that the exhibit's presence in the jury room could not have swayed the jury. We agree.

First, appellant has not shown how Exhibit 2, a photograph of the victim's face and head, led the jury not to consider an alternative perpetrator, as mentioned in its note. This photograph was virtually identical to several other photographs of the child that were admitted and properly provided to the jury during deliberations. As such, Exhibit 2 was cumulative of other exhibits with the jury during deliberations. In similar circumstances, we have concluded that "where the exhibit was cumulative of other testimony at trial, the improperly admitted evidence could not have 'substantially swayed' the jury." *Edwards v. United States*, 785 A.2d 292, 295 (D.C.2001) (citing *Parker v. United States*, 601 A.2d 45, 53 (D.C.1991)) (other citation and internal quotation marks omitted.) In *Edwards*, defendant, who had been convicted of voluntary manslaughter and other crimes, moved for a new trial on the ground that two photographic exhibits were given to the jury which had not been admitted into evidence. *Id.* This court affirmed the trial court's denial of the motion, in part, because the photos were cumulative of other evidence, including detailed testimony of the medical examiner. *Id.*[9]; *see also Parker*, 601 A.2d at 53 (affirming denial of a motion for a mistrial where an unredacted copy of a Drug Enforcement Administration form, cumulative of other evidence, was submitted inadvertently to the jury). Appellant has not shown how one more virtually identical photograph of the victim could have swayed the jury.

---

**9.** In *Edwards*, other reasons cited for affirming included that the photographs were consistent with the appellant's self-defense claim, apparently accepted by the jury in finding him not guilty of the greater offenses, and evidence against him for the offense of conviction was strong. *Edwards, supra*, 785 A.2d at 295. Here, appellant's defense theory was that the injuries from which the child died were not caused by him, but by the emergency medical treatment he received.

428

There is nothing in the jury's notes or the timing of the notes to suggest even remotely that the jury was persuaded not to consider an alternate suspect because of the additional un-admitted photograph. All of the exhibits, including Exhibit 2, were provided to the jury at the beginning of deliberations on November 19, 2010. The note withdrawing the question the jury had submitted on November 23rd referencing consideration of a third party alternative was sent to the court on November 29th. Appellant has failed to show how the timing of these events reasonably leads to an inference that the jury's decision to withdraw its alternate theory question had a connection with the un-admitted exhibit.

Appellant has not argued, nor could he based on our review of the evidence, that the un-admitted photograph was more incriminating or inflammatory than the photographs that were properly admitted. Given that this cumulative photograph did not convey new, extrajudicial facts to the jury, we cannot conclude that it impermissibly swayed them. *See Edwards, supra,* 785 A.2d at 295. Therefore, we find no abuse of discretion in the trial court's decision denying appellant's motion for a new trial.

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*